**Karen GARCIA–PAZ, Plaintiff,**

v.

**SWIFT TEXTILES, INC., Defendant.**

**Civ. A. No. 94–2076–KHV.**

United States District Court,
D. Kansas.

Jan. 2, 1995.

Ruth M. Benien, Benien & Kaplan, Chtd., Kansas City, KS, for Karen Garcia–Paz.

David J. Adkins, Bennett, Lytle, Wetzler, Martin & Pishny, L.C., Prairie Village, KS, Michael L. Blumenthal, Edward Katze, Constangy, Brooks & Smith, Atlanta, GA, for Swift Textiles Inc.

### MEMORANDUM AND ORDER

VRATIL, District Judge.

Karen Garcia–Paz, a former account executive for the Kansas City office of Swift Textiles, Inc., alleges that Swift discriminated against her on the basis of age, sex, and perceived disability, in violation of the Age Discrimination in Employment Act [ADEA], 29 U.S.C. § 621 et seq., the Kansas Age Discrimination in Employment Act [KADEA], K.S.A. § 44–1111 et seq., Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq., as amended, the Kansas Act Against Discrimination [KAAD], K.S.A. § 44–1001 et seq., and the Americans With Disabilities Act [ADA], 42 U.S.C. § 12101 et seq. In addition, plaintiff brings pendent state law claims for breach of an implied contract of employment and negligent and intentional infliction of emotional distress.

This matter comes before the Court on *Defendant's Motion for Summary Judgment* (Doc. # 36) filed November 1, 1994.[1] Having considered the entire record in this case, for reasons stated more specifically below, the Court finds that said motion should be and hereby is sustained.

---

1. In opposing defendant's motion for summary judgment, plaintiff asks the Court to strike the motion and accompanying memorandum for non-compliance with Rule 112(c) of the Rules of Practice and Procedure of this Court. In the alternative, plaintiff asks the Court to strike and refuse to consider any statements contained in footnotes which contain factual assertions and conclusions that do not comply with the Local Rules.

For reasons stated in *Defendant's Reply to Plaintiff's Suggestions to [sic] Opposition to Defendant's Motion for Summary Judgment* (Doc. # 56), filed December 8, 1994, both requests are denied.

### Standards for Summary Judgment

Rule 56(c) of the Federal Rules of Civil Procedure directs the entry of summary judgment in favor of the party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." A principal purpose "of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses...." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986). The court's inquiry is to determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Entry of summary judgment is mandated, after an adequate time for discovery and upon motion, against a party who fails to make a showing to establish the existence of an element essential to that party's case, and on which that party bears the burden of proof at trial. *Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 893 (10th Cir.1994). Summary judgment is inappropriate, however, if there is sufficient evidence on which a trier of fact could reasonably find for the nonmoving party. *Prenalta Corp. v. Colorado Interstate Gas Co.*, 944 F.2d 677, 684 (10th Cir.1991).

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact by informing the court of the basis for its motion. *Martin v. Nannie and the Newborns, Inc.*, 3 F.3d 1410, 1414 (10th Cir.1993). This burden, however, does not require the moving party to "support its motion with affidavits or other similar materials *negating* the opponent's claim." *Celotex*, 477 U.S. at 323, 106 S.Ct. at 2553 (emphasis in original). Once the moving party properly supports its motion, the nonmoving party may not rest upon mere allegation or denials of his or her pleadings, "but must set forth specific facts showing that there is a genuine issue for trial...." *Muck v. United States*, 3 F.3d 1378, 1380 (10th Cir.1993). The court reviews the evidence in a light most favorable to the nonmoving party, *e.g., Thrasher v. B & B Chem. Co., Inc.*, 2 F.3d 995, 996 (10th Cir.1993), under the substantive law and the evidentiary burden applicable to the particular claim. *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513–14.

### Undisputed Facts

On January 20, 1989, Swift hired plaintiff—a white woman over the age of 40—to open a one-person office in Kansas City. Swift manufactures denim fabric, and the primary purpose of the Kansas City office was to better service and sell more denim to one of its customers, the Lee Company [Lee]. Plaintiff was hired as an account executive and her primary duty, at least initially, was to service the Lee account. Effective working relationships were a critical element of plaintiff's position, and her position required her to effectively interface with all areas of both Swift and Lee. As an account executive, plaintiff did not merely sell fabric to Lee; she was responsible for positioning Swift fabric by knowing how it would fit into Lee product lines in order to influence Lee's manufacturing process. As an account executive, plaintiff was responsible for orchestrating product presentations, presenting product, developing relationships, and making sure that Swift followed up on all product opportunities with Lee and other key accounts. Within the Lee organization, Linda Illiff (director of procurement) and Mike McEntire (her boss) were important contact relationships for plaintiff.

On August 21, 1990, some 19 months after she assumed her position with Swift, plaintiff was diagnosed with multiple sclerosis [MS]. After the onset of plaintiff's MS, she experienced fatigue and loss of energy. Beginning in January 1992, she experienced a dramatic decrease in her energy level, so that by June 1992, her energy level was 15 to 20 *per cent* of normal.

In the spring of 1991, Larry Addison, plaintiff's supervisor, discussed with plaintiff certain customer service complaints which he had received from McEntire. Plaintiff disputed the legitimacy of the complaints because she thought that McEntire was a "chronic complainer" and "notorious back

stabber," but she admits that his complaints were important and if true, gave Swift legitimate grounds for concern.

On July 1, 1991, John Heldrich became president of Swift's North American Marketing division. In September 1991, Heldrich assigned plaintiff the Lands' End account. Lands' End was a "huge player" and a billion-dollar account. Plaintiff was delighted with the assignment and welcomed the added responsibility even though it required more work.

Over time, Heldrich became concerned about retaining the Lee account. In March or April of 1991, Lee had asked Swift to become a vendor partner. Such a relationship involved a larger magnitude of business and, according to plaintiff, "we [at Swift] were delighted because we came from nowhere with these people." Meanwhile, it had become clear to Heldrich that the key to Swift's success with Lee was the account executive, and that person was plaintiff. Heldrich believed that the single most important ingredient to success at Lee was the account executive's ability to quarterback Swift's support mechanisms and provide the product and service that Lee required.

■ Between November 1991, and March/April 1992, however, Heldrich received criticism of plaintiff from sources at Lee, including McEntire and Illiff. Those complaints included the following:[2]

In March 1992, McEntire asked Heldrich whether Swift could get plaintiff more motivated, more involved and more understanding in working with Lee. McEntire complained that plaintiff did not know the Lee account and, as a result, Swift was not focused on Lee's product the way it needed to be. McEntire also complained that Swift was not working the various areas from a

merchandising standpoint the way it needed to and that this was a real barrier in Swift's ability to become a close and comfortable partner with Lee. McEntire attributed the problem to plaintiff. McEntire also told Heldrich that while Swift's competitors "lived at Lee," plaintiff was not there a lot of the time, arrived late and left early, failed to return telephone calls, was often rude, and refused to carry out simple requests like labelling products.

Heldrich also received complaints from Swift employees about plaintiff's handling of the Lee account. In April 1992, Tony Carnot, Swift's Director of Merchandising, complained that plaintiff did not understand Lee's product line and other requirements. He told Heldrich that there was an "uncomfortability" in meetings between Lee and plaintiff and that plaintiff had created a hostile environment by disagreeing with him about price in front of Lee employees.

Ed Davis, Swift's Director of Development, complained to Heldrich that plaintiff lacked the ability to pull the areas together and to communicate Swift products to Lee Company and that there was antagonism between plaintiff and some areas within Lee.

Arnold Elder, Swift's Vice President of Marketing, complained to Heldrich that based upon his communications with Lee, Lee was uncomfortable with plaintiff, and she could not have the relationships at Lee which were necessary to support the growth which Lee and Swift had planned together.

Carla Argall, women's merchandiser at Lands' End, also criticized plaintiff's performance to Heldrich. Hal Durant told Heldrich that Argall had also complained to him that she had a difficult time working with plaintiff, that she could not get information from plaintiff on a regular and punctual ba-

**2.** Plaintiff objects that the statements attributed to McEntire, Illiff, Carnot, Davis, Elder, Durant, Kohler, and Hair are hearsay and thus inadmissible for purposes of a summary judgment motion. Her position is ill-taken, however, because such statements are not offered for the truth of the matter asserted, but to prove defendant's motive in terminating plaintiff's employment. Rule 801(c), Federal Rules of Evidence; *Denison v. Swaco Geolograph Co.,* 941 F.2d 1416, 1423 (10th Cir.1991).

Plaintiff also denies the accuracy of the statements attributed to those individuals and objects to the later submission of affidavits which plaintiff would not have the opportunity to oppose or controvert at this stage in the litigation. This objection is unsupported in the manner required by Rule 56(f) of the Federal Rules of Civil Procedure, and it is legally insufficient to defeat defendant's motion for summary judgment.

sis, that she was not being called upon by plaintiff the way she desired, and that she was not being shown product in the way she wanted to be shown product.

Ron Kohler of Hagle Industries also called Heldrich. Kohler said that he wanted Irene Troost to handle the Hagle account because he had not had good experiences with plaintiff or he did not hear good things about her.

In late April or early May of 1992, Heldrich ran into Jerry Hair of Rocky Mountain Clothing, a Swift customer. Hair told Heldrich that he would like him to do something about replacing plaintiff because his people did not want to deal with her.

After May 1992, Heldrich continued to receive complaints and criticism about plaintiff from both Lee and Lands' End. On July 24, 1992, Heldrich came to Kansas City for a meeting with Lee. At that time, McEntire asked Heldrich to remove plaintiff from the Lee account because if Swift wanted its business with Lee to grow, Swift needed somebody on the account with better availability and capability than plaintiff. Illiff concurred in McEntire's request.

Sixty days later, on September 29, 1992, Heldrich terminated plaintiff's employment. Plaintiff's termination notice stated that the

ground for termination was "inability to develop and maintain positive relationships."

### *Analysis*

#### A. Disability Claims

Plaintiff claims that she suffered from multiple sclerosis and that defendant discriminated in the matter of her employment, in the terms and conditions of her employment, and eventually terminated her employment in violation of the ADA and the Civil Rights Act of 1991. Specifically, plaintiff claims that Swift discriminated against her on the basis of a "perceived disability."[3]

#### 1. Termination Claims

■ In order to state a *prima facie* case of disability discrimination under the ADA, plaintiff must show that she is a "qualified individual with a disability" under 42 U.S.C. § 12112(a). The term "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). Defendant argues that at the time it terminated plaintiff's employment, she was totally disabled from performing each material duty of her regular occupation.[4] Accordingly, it claims that as a matter

---

**3.** The evidence that Heldrich perceived plaintiff to be disabled is slim, and the Court expresses no opinion on its sufficiency. With reference to her claim that Heldrich knew she was "disabled," plaintiff's deposition testimony was as follows:

Q. Isn't it a more accurate statement ... that he knew you had been sick, as opposed to knew that you were currently ill?
A. I don't think that made any difference. He knew I had a severe neurological problem....
Q. That was in the past; correct?
A. That's correct.
Q. That was almost a year earlier; correct?
A. That's correct. * * *
Q. And is it your testimony today under oath that based upon that conversation [at Cafe Alegro], that somehow he was supposed to have concluded you were a sick person?
A. He didn't have to know what the illness was or how sick I was. I told him I had problems with fatigue but that I was okay and it wasn't but a week later that comments were being made about my energy level....

*Deposition of Karen A. Garcia–Paz* (Volume V, August 4, 1994) at 562–63.

Moreover, plaintiff does not claim that Heldrich perceived her to have MS or any other medical disability, but only that he perceived her as having a low energy level. Plaintiff's testimony in this regard is as follows:

Q. [Aside from the conversation at Cafe Alegro], what other reasons do you believe he perceived you to have a disability?
A. I believe John discriminated against anybody he thought was less than perfect. In other words, active, energetic.... That's not proper.

*Id.* at 598. The Court expresses no opinion whether (in plaintiff's words) being "less than perfect" is a "disability" for purposes of the ADA.

**4.** Plaintiff's position in this case is fundamentally at odds with the position which she has taken for purposes of obtaining long-term disability and social security disability benefits. To obtain such benefits, plaintiff has taken the position that she is unable because of sickness or injury to perform each material duty of her regular occupation. Plaintiff claims that "with accommodation" (more time, because of her reduced energy level) she fulfilled her job responsibilities until

of law, plaintiff was not a "qualified individual with a disability" and she cannot establish a *prima facie* case of discrimination under the ADA.

Immediately after her termination, on September 29, 1992, plaintiff notified Swift that she intended to claim long-term disability [LTD] insurance benefits. After her termination, plaintiff reviewed the Swift booklet on LTD benefits and concluded that she was qualified for benefits since, because of injury or sickness, she "[could] not perform each of the material duties of [her] regular occupation." Consequently, on November 11, 1992, plaintiff submitted a claim for LTD benefits. In doing so, she represented that she had been totally disabled since August 21, 1990—the date of her initial diagnosis with MS. In submitting her Disability Claim form, plaintiff acknowledged that "[a]ny person who knowingly and with intent to defraud any insurance company or other person files a statement containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material hereto, commits a fraudulent insurance act, which is a crime."

On May 27, 1993, the LTD insurance company notified plaintiff that her claim for benefits had been approved. Plaintiff thereafter received benefits for long term disability commencing on September 29, 1992—the date of her termination—and she continues to receive such benefits.

On October 29, 1992, plaintiff applied for federal Social Security Disability benefits, claiming that she had become unable to work on September 29, 1992—again, the date of her termination. In applying, plaintiff acknowledged that "anyone who makes or causes to be made a false statement or representation of material fact in an application or for use in determining a right to payment

under the Social Security Act commits a crime punishable under federal law by fine, imprisonment, or both." Plaintiff also affirmed that "all information ... given in connection with this claim is true."

On February 3, 1993, the Social Security Administration issued a finding of disability commencing September 29, 1992, and plaintiff has received benefits for all periods thereafter.

On this record, the Court must conclude that plaintiff is not a "qualified individual with a disability," and that on these facts, plaintiff is estopped from claiming otherwise for any period on or after September 29, 1992. *E.g., Reigel v. Kaiser Found. Health Plan of N. Carolina,* 859 F.Supp. 963 (E.D.N.C.1994); *August v. Offices Unlimited, Inc.,* 981 F.2d 576 (1st Cir.1992); *Beauford v. Father Flanagan's Boys' Home,* 831 F.2d 768 (8th Cir.1987), *cert. denied,* 485 U.S. 938, 108 S.Ct. 1116, 99 L.Ed.2d 277 (1988); *Peoples v. City of Salina,* 1990 WL 47436 (D.Kan.1990). Plaintiff, her counsel, and her physician have consistently represented that as of that date, because of injury or sickness, she has been unable to perform each material duty of her regular occupation. Having collected substantial benefits, based on these unambiguous and seemingly informed representations, plaintiff is estopped from now claiming that she *could* perform the essential functions of her position.[5]

Plaintiff would avoid this result by arguing that "[q]ualification for long-term disability benefits under a particular insurance policy or plan is not conclusive of Garcia-Paz's inability to perform the essential functions of her employment from either a legal or a factual standpoint," because plaintiff merely filled out the forms (fraudulent or not) and "left the determination of whether she was

the date of termination. For periods on and after September 29, 1992, however, the record contains no medical evidence that plaintiff can perform any essential function of her former position, with or without accommodation.

5. Swift seeks to extend to period of plaintiff's total disability to encompass the entire period during which plaintiff complains of unlawful conduct, and thus bar altogether any claim of discrimination. Swift's position, apparently, is

that even though it employed plaintiff until September 29, 1992, she was so disabled that she could not and was not performing the essential elements of her position. Swift has not established this proposition as an undisputed fact, however, and it is arguably estopped from even advancing this argument under the theories which estop plaintiff from maintaining that she is able to work while simultaneously accepting disability benefits.

entitled to benefits based upon the medical evidence up to the [insurance] company." Plaintiff argues that to hold otherwise, *i.e.* to allow an employer to terminate an employee for unlawful reasons, and then attempt to defend that action after the fact by asserting a partial or temporary handicap, would subvert the meaning and intent of the remedial legislation. The Court, however, is unconvinced.

In holding as a matter of law that plaintiff is not a "qualified individual with a disability" on or after September 29, 1992, the Court effectively disposes of the claim that Swift violated the ADA or otherwise discriminated against plaintiff on the basis of real or perceived disability, in terminating her employment.

**6.** Plaintiff also claims that Heldrich exacerbated her disability status and thereby lowered her energy level and ability to perform. She claims that her MS was controllable and not disabling until Heldrich subjected her to additional stress, embarrassment, humiliation, and increased work, and that his conduct ultimately led to her debilitating condition. Plaintiff's claim for physical injury in this respect is barred by the Kansas Workers' Compensation Act.

In addition, plaintiff alleges that Heldrich subjected her to handicap-related comments and remarks from July 1991 to September 29, 1992. The Court addresses these allegations in Section D, which deals with harassment.

**7.** Plaintiff's testimony on this point is equivocal and self-contradictory, and would support no reasonable inference of retaliation if this case were tried to a jury. Plaintiff testified that Heldrich "laid the Lands' End account on me, which, you know, that's like a billion dollar account. And with that came a tremendous amount of work." *Deposition of Karen A. Garcia–Paz* (Volume IV, August 3, 1994) at 383. She continued as follows:

Q. I believe you testified Lands' End is a big player.
A. Huge. They're a huge player.
Q. And they're important to Swift?
A. They're important to Swift, that's correct.
* * *
Q. Is this added responsibility something you wanted or didn't want?
A. To be very honest, I wanted it, because I enjoyed working with different people. Healthwise and timewise and for the benefit of the Lee Company, no, I should not definitely have taken it.
Q. Okay. So your view was that while you wanted this responsibility, you didn't think it was a good business decision to assign you these added responsibilities; correct?
A. That's correct.

## 2. Pre–Termination Claims

Plaintiff claims that even before Swift terminated her employment, it engaged in discriminatory treatment based upon her "perceived disability." Specifically, plaintiff claims that from July 1991, when he became her immediate supervisor, until September 29, 1992, when he fired her, Heldrich treated plaintiff differently from similarly-situated non-handicapped individuals, assigned her additional work because of her handicap, and denied her secretarial and other services on account of her handicap.[6] As evidence, plaintiff claims that (a) shortly after he learned she was ill, Heldrich "laid a billion-dollar Lands' End account on [her]";[7] (b) that Heldrich denied her secretarial services and

Q. Did you express that disagreement to Mr. Heldrich?
A. Yes. * * * I tried to. It was not permitted.
Q. You tried to disagree but he wouldn't permit you to disagree?
A. I didn't try to disagree. I tried to tell him ... that this would be way too much, but that avenue was not allowed to me ... [b]ecause of Mr. Heldrich's behavior prior to that toward me and other individuals.

*Id.* at 384–87. In other words, plaintiff did not express any disagreement with Heldrich's assignment of the Lands' End account. Moreover, her argument is essentially one that Swift would cut off its nose to spite its face, as she tacitly conceded in the following deposition testimony:

Q. Let me ask you a question. * * * Does it make any sense in your mind to place a billion dollar account in the hands of somebody who couldn't do it?
A. Unless you were retaliating against that individual. * * * Unless you wanted to persecute and break that person down and set that person up.
Q. So you're suggesting that Mr. Heldrich, in order to retaliate against you, in order to set you up, he entrusted a billion dollar account to you? That's your testimony you believe?
A. I'm not saying it was just that.

*Deposition of Karen A. Garcia–Paz* (Volume V, August 4, 1994) at 564. Plaintiff's testimony continued as follows:

Q. ... [I]t was not okay for Mr. Heldrich to have given you the Lands' End account?
A. No. I was delighted to get the Lands' End account. That's what I said at the onset.
Q. So you were delighted to get the Lands' End account?
A. Uh-huh, uh-huh.
Q. But your testimony just a minute ago was he gave you that account to set you up; correct?

in March, 1992, refused to renew her lease on office space; and (c) that Heldrich persecuted her by repeatedly blaming her for problems she did not create. Finally, plaintiff claims that Heldrich discriminated against others in the protected class, *i.e.* Donna Borgida, Swift's Merchandising Manager, who had problems with a spinal tap and developed a sixth nerve palsy, lost her peripheral vision, and developed triple vision. According to plaintiff, Heldrich repeatedly sent Borgida on out-of-town trips when she was not well enough, then fired her for having "low energy."

■ The ADA became effective on July 26, 1992, and it does not apply retroactively. *E.g., O'Bryant v. City of Midland,* 9 F.3d 421 (5th Cir.1993); *Raya v. Maryatt Indus.,* 829 F.Supp. 1169 (N.D.Cal.1993); *Aramburu v. The Boeing Co.,* 1993 WL 544567 (D.Kan. 1993). The alleged failure to renew plaintiff's lease occurred prior to the effective date of the ADA and is therefore not actionable.[8] On this record, however, the Court cannot precisely determine what portion of the remaining conduct occurred after July 26, 1992. Regardless of the precise date, however, the Court finds that the foregoing claims are not actionable because plaintiff has failed to make a *prima facie* case of intentional discrimination. In light of plaintiff's deposition testimony that she was "delighted" to receive the Lands' End account and welcomed the additional responsibility, she can hardly be heard to complain that, in

retrospect, she should not have accepted it. Much less can she credibly argue that the assignment represented adverse retaliatory action by Heldrich.

As to her remaining complaints, plaintiff has introduced no evidence that Heldrich adversely affected her employment in the respects claimed or, more importantly, that he did so on account of any perceived disability on plaintiff's part. Significantly, plaintiff tenders no *evidence* that Heldrich treated her any differently than non-disabled employees prior to her termination.[9] Accordingly, defendant is entitled to summary judgment on plaintiff's ADA claim for Heldrich's pre-termination conduct.

### B. Sex Discrimination under Title VII and the KAAD

Plaintiff claims that defendant violated Title VII of the Civil Rights Act of 1991 and K.S.A. § 44–1001 *et seq.,* by discriminating against her on the basis of sex. In support of that claim, plaintiff identifies two instances of differential treatment:

■ First, plaintiff complains that on one occasion at an out-of-town meeting, Heldrich summoned the male account executives, by name, and made arrangements to go for dinner. The women gathered in Borgida's room and sent out for pizza. Second, plaintiff claims that Heldrich gave plaintiff last-minute notice of meetings, although she was the mother of a small child.[10] Plaintiff has failed

---

A. I didn't say that.
*Id.* at 569.

**8.** Even on the merits, plaintiff's claim is insubstantial. When Swift hired plaintiff in January, 1989, it had no office in Kansas City. Plaintiff therefore worked out of her home until April, 1989. Plaintiff preferred to work in an office environment but, according to her deposition testimony, "whatever they wanted was fine." *Deposition of Karen A. Garcia–Paz* (Volume III, August 2, 1994) at 313. The option to continue working at home was unsatisfactory "just in terms of the way it would look to the Lee Company." *Id.* at 312. For purposes of this discussion, however, the point is that while Swift may not have renewed the lease, it never *terminated* it. Accordingly, plaintiff kept her office and was not required to move back to her home.

**9.** For example, with respect to secretarial support, plaintiff testified that Swift's Kansas City

office "was a one-person office from the day [she] began occupying it in April of 1989 until [her] last day of employment." She never had authority to hire support staff, and the record is devoid of evidence that Swift favored other account executives with any different arrangement. *Deposition of Karen A. Garcia–Paz* (Volume III, August 2, 1994) at 316. Moreover, plaintiff never discussed the matter with Heldrich. *Deposition of Karen A. Garcia–Paz* (Volume V, August 4, 1994) at 557.

**10.** Plaintiff cites one specific instance, on the morning of September 16, 1991, when she received word that she needed to be in Dodgeville, Wisconsin, the following morning, for a very important meeting with Lands' End. Plaintiff initially indicated that she could not go because she did not have a babysitter. Hal Durant told plaintiff to reconsider her position or face "repercussions." As a result, plaintiff arranged for

to demonstrate that either incident constituted adverse action with respect to her employment, and the Court finds that as a matter of law, neither incident gives rise to an actionable claim of pre-termination discrimination.

■ Finally, because Swift filled her position with a male and her own performance had been better than average, plaintiff complains that Swift terminated her employment on account of her sex.

■ The Court assumes without deciding that plaintiff has presented a *prima facie* case of intentional discrimination under Title VII and the KAAD and turns immediately to the issue whether plaintiff has demonstrated a triable issue of fact as to pretext. *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 801–04, 93 S.Ct. 1817, 1823–25, 36 L.Ed.2d 668 (1973); *Texas Dep't of Community Affairs v. Burdine,* 450 U.S. 248, 253–56, 101 S.Ct. 1089, 1093–94, 67 L.Ed.2d 207 (1981). Swift has advanced a facially nondiscriminatory reason for plaintiff's termination, *i.e.,* her inability to develop and maintain positive relationships with customers. To avoid summary judgment in an employment action after an employer has offered a legitimate nondiscriminatory reason for the action taken, plaintiff must produce specific facts to show a genuine issue of fact as to pretext. *Branson v. Price River Coal Co.,* 853 F.2d 768, 771–72 (10th Cir.1988). Mere assertions and conjecture are insufficient to survive summary judgment. *Id.* In addition, it is not sufficient to show that the employer's stated reasons are untrue; plaintiff must also show that the proffered reasons are a pretext *for discrimination.* *EEOC v. Flasher Co., Inc.,* 986 F.2d 1312, 1321 (10th Cir.1992).

Plaintiff has not met this burden on the record in this case. The record contains no evidence that plaintiff's gender was a substantial factor in her termination. Plaintiff

admits that Heldrich "had a perception, right or wrong, that [she] had a problem with some of [her] customers and some of these same customers were not particularly happy with [her.]" *Deposition of Karen A. Garcia–Paz* (Volume V, August 4, 1994) at 607. Her suspicion that illegal factors outweighed this information in the decisional process does not create a triable issue with respect to pretext. For these reasons, and in light of the Court's finding that plaintiff was not qualified for her job on or after September 29, 1992, defendant is entitled to summary judgment.

## C. Age Discrimination Under the ADEA and KADEA

Plaintiff claims that defendant violated the ADEA, 29 U.S.C. § 621 *et seq.,* and the KADEA, K.S.A. § 44–1111 *et seq.,* by underappraising and demoting older employees to force resignations, providing unfair and untrue performance evaluations and reviews, terminating plaintiff and other employees due to age or age-related characteristics, and retaliating against plaintiff for opposing or objecting to age-related comments.[11] Of these claims, only two afford plaintiff a colorable claim for relief: termination and retaliation.

As evidence of these claims, plaintiff cites the following:

First, Swift replaced plaintiff with a younger employee while her performance was better than average when she was fired.

Second, at a sales meeting in Columbus, Georgia, in early February, 1992, Heldrich showed a professional videotape about paradigms, introduced his personal beliefs about management, and displayed an organizational chart about how Swift would be structured. On the second day of the meeting, according to plaintiff, Heldrich implied that older employees were unable to escape their para-

her husband to babysit, and she attended the meeting. *Deposition of Karen A. Garcia–Paz* (Volume IV, August 3, 1994) at 434–37. Plaintiff does not know whether the other Swift employees who attended this meeting received similarly short notice. *Id.* at 440. Her complaint is that as a working mother, she had to ask for accommodations which were either not given or were used as reasons for termination, and that "[t]hat is not, you know, legitimate." *Deposition of Kar-*

*en A. Garcia–Paz* (Volume V, August 4, 1994) at 601. This argument is devoid of factual or legal merit.

11. Plaintiff also complains that Heldrich made age-related comments, verbally harassed older workers, and misrepresented to older workers their job abilities. The Court addresses this complaint in Section D, dealing with harassment.

digms, unable to change, and unable to accept his vision for the future of Swift.[12] He went on to name three young salespeople, stating that the future was theirs because they were capable of change. After this speech, Gordon Gregory, an older employee, asked a simple question about reports. Heldrich responded, "Now, there. You see. That's just what I'm talking about"—apparently referring to Gregory as a victim of paradigms. According to plaintiff, Heldrich "went on and on and on," so she raised her hand and "came sort of to the defense" of Gregory. Specifically, what plaintiff said was: "Well, I can understand what he means. I'm not really clear, Mr. Heldrich, what you want on these reports either. I've seen some that have I don't think very newsworthy information. I'm not clear." Heldrich replied that he wanted to "hear everything," then "went on again" about "[y]ou people, you're not going to change." At that point plaintiff said to him, "John, I'm not 20, and I'm not 30, but ... I've been able to make changes in my life ... and I know all of these other people have ... [and] [y]ou've got to give us a chance." *Deposition of Karen A. Garcia–Paz* (Volume IV, August 3, 1994) at 467–68. After the meeting, several employees told plaintiff that her days were numbered for standing up to Heldrich.

## 1. Termination Claim

Claims brought under the ADEA and the KADEA are subject to the same indirect method of proof as employment cases under Title VII. *Adair v. Beech Aircraft Corp.*, 1991 WL 97610 at *17 (D.Kan. 1991). For reasons stated above, with respect to plaintiff's claim of sex discrimination, the Court finds that defendant is entitled to summary judgment.

## 2. Retaliation

Plaintiff contends that Swift retaliated against her for opposing age discrimination by Heldrich. To establish a *prima facie* case of retaliation, a plaintiff must show: "(1) protected opposition to discrimination or participation in a proceeding arising out of discrimination; (2) adverse action by the employer contemporaneously or subsequent to the employee's protected activity; and (3) a causal connection between such activity and the employer's action." *Anderson v. Phillips Petroleum Co.*, 861 F.2d 631, 634 (10th Cir. 1988); *see also Meredith v. Beech Aircraft Corp.*, 18 F.3d 890, 896 (10th Cir.1994). In this case, plaintiff fails to establish either protected opposition or a causal connection.

### a. *Protected Opposition*

The ADEA makes it unlawful for an employer to discriminate against any employee because that individual "has opposed any practice made unlawful" by the Act. 29 U.S.C. § 623(d). Plainly absent from this language is any protection for persons who simply champion the cause of an older worker, even if the advocate acts out of an unarticulated belief that the employer is discriminating on the basis of age. Thus, liability will not attach unless the activity in question advances beyond advocacy and into recognizable opposition to an employment practice that the claimant reasonably believes to be unlawful. *See Love v. RE/MAX of Am., Inc.*, 738 F.2d 383, 385 (10th Cir.1984).

Congress intended ADEA § 623(d) "to protect a wide range of activity in addition to the filing of a formal complaint." *Whitten v. Farmland Indus., Inc.*, 759 F.Supp. 1522, 1538 (D.Kan.1991). At one end of the spectrum, it is well-established that an employee's express complaints to su-

---

12. Plaintiff's specific testimony was as follows:
[W]e were all extremely tensed because John just was extremely emotional, extremely volatile, extremely involved in the subject, and *really was accusing everybody in that room*, even though it was in a general sense, of being paradigms—you know, of being victims of paradigms, and he was doubting our—their—our ability to be able to change sort of in a berating type manner. That he had all of these visions and ideas and he didn't think these old para- digms would change. Then—I mean he went on about it and everybody was astounded, shocked. * * * Because the message was clear. * * * Which was he was *implying* that because we had been within the company, we were old, we were not going to be able to change. We were victims of paradigms. We didn't have the flexibility.
*Deposition of Karen A. Garcia–Paz* (Volume IV, August 3, 1994) at 463–64 (italics added).

pervisors about perceived discriminatory practices constitutes protected activity. *See Lambert v. Genesee Hosp.*, 10 F.3d 46, 55 (2d Cir.1993), *cert. denied,* —— U.S. ——, 114 S.Ct. 1612, 128 L.Ed.2d 339 (1994); *Cobb v. Anheuser Busch, Inc.*, 793 F.Supp. 1457, 1489–90 (E.D.Mo.1990). At the other end of the spectrum, however, the "wide range" of protected activity clearly does not include those situations where the opposition relates not to unlawful employment practices but to a personal grievance. *See Allen v. Denver Pub. Sch. Bd.*, 928 F.2d 978, 985 (10th Cir. 1991); *Aldridge v. Tougaloo College*, 847 F.Supp. 480, 484–85 (S.D.Miss.1994) (grievance mentioned posting of job vacancy and instances of alleged unfair treatment); *E.E.O.C. v. MCI Telecommunications Corp.*, 820 F.Supp. 300, 308 (S.D.Tex.1993) (concerns centered on posting of job openings); *Kauffman v. Kent State Univ.*, 815 F.Supp. 1077, 1084–85 n. 3 (N.D.Ohio 1993) (plaintiff complained about having to do supervisor's personal work), *aff'd,* 21 F.3d 428 (6th Cir. 1994). While some courts have indicated that vague references to unspecified discrimination are not protected, no clear rule has emerged as to the level of specificity required, and the standard employed by most courts is not exacting. *Compare Booker v. Brown & Williamson Tobacco Co.*, 879 F.2d 1304, 1313 (6th Cir.1989) (allegation of "ethnocism" insufficient) *with Grant v. Hazelett Strip–Casting Corp.*, 880 F.2d 1564, 1567–70 (2d Cir.1989) (mock memo listing age and gender qualifications for certain position permitted finding of opposition); *Truskoski v. ESPN, Inc.*, 823 F.Supp. 1007, 1012 (D.Conn. 1993) (complaints about disparate impact of staffing policy had "overtones of gender bias and discrimination").

▮ Employees often do not speak with the clarity or precision of lawyers. At the same time, however, employers need not approach every employee's comment as a riddle, puzzling over the possibility that it contains a cloaked complaint of discrimination. But the thrust of inartful, subtle, or circumspect remarks nevertheless may be perfectly clear to the employer, and the Court discerns no evidence that Congress intended to protect only the impudent or articulate. The relevant question, then, is not whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an unlawful discriminatory manner.

▮ On this record, the Court is not satisfied that, for purposes of establishing this *prima facie* element, plaintiff's remarks sufficiently conveyed any concerns about the possible unlawfulness of defendant's conduct under the ADEA or the KADEA. The record supports no reasonable inference that Heldrich engaged in unlawful activity by discussing paradigms, flexibility, and change with his sales crew. While plaintiff inferred a sinister motive in his approach, a jury on this record could not logically infer that when plaintiff supported Gregory's request for information, she was engaged in protected opposition to an unlawful practice or reasonably believed that she was so engaged. Thus, as a matter of law, plaintiff's conduct did not constitute protected opposition.

### b. *Causal Connection*

▮ Plaintiff has also failed to establish a sufficient causal connection. The causal connection element requires that plaintiff establish that the protected opposition and adverse action are not wholly unrelated, *Whitten v. Farmland Indus., Inc.*, 759 F.Supp. 1522, 1539 n. 18 (D.Kan.1991), and such an inference is permissible where the adverse action closely follows the protected activity, *see Burrus v. United Tel. Co. of Kansas*, 683 F.2d 339, 343 (10th Cir.1982), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). Plaintiff's alleged protected opposition occurred in early February 1992. The alleged adverse action in this case occurred when defendant terminated her employment on September 29, 1992. Thus, the adverse action followed plaintiff's alleged protected activity by eight or nine months.

Prior opinions of this Court have noted the "uncertain parameters" of the proximity test for establishing a causal connection. *See Boyce v. Board of County Comm'rs*, 1994 WL 116327 at *3 & n. 14 (D.Kan.1994). The Court is satisfied, however, that the interval

in this case does not support a reasonable inference of a causal connection. Given the total dearth of other evidence of discriminatory motive, the fact that the termination was somewhat proximate in time is insufficient to defeat defendant's motion for summary judgment.

### D. Harassment Based on Age, Sex and Disability

The Court assumes without deciding that plaintiff's harassment claims may be reasonably related to her claims for discrimination and retaliation, *see, e.g., Brown v. Hartshorne Pub. Sch. Dist.*, 864 F.2d 680, 682 (10th Cir.1988); *Beeson v. Security Benefit Life Ins. Co.*, 1991 WL 50296 (D.Kan.1991), and that for purposes of this motion, plaintiff should be allowed the opportunity to prove those claims. *See Witherspoon v. Roadway Express, Inc.*, 782 F.Supp. 567, 572 (D.Kan. 1992) ("the Equal Employment Opportunity Act is a remedial statute to be liberally construed in favor of the victims of discrimination").

■■■■ Plaintiff's evidence of harassment based on age, sex and disability is as follows:

In August 1991, shortly after Heldrich arrived, Swift representatives met Lee representatives for dinner at Cafe Alegro in Kansas City. In general conversation, plaintiff commented that she had been in the hospital. Heldrich, who was seated across the table from plaintiff, questioned "You were in the hospital? What were you in the hospital for?" [13] Plaintiff answered that she had been hospitalized twice for a neurological problem and said that she had been blinded, had suffered weakness, and had some problems with fatigue. She also told Heldrich "I was okay. I was okay." [14] The subject was apparently dropped at that point but, according to plaintiff, Heldrich "looked at me for a long time."

One week later, Heldrich began making "constant and consistent reference" to plaintiff's energy level.[15]

In September 1991, the topic again arose as plaintiff and Heldrich were approaching the Lands' End headquarters in Dodgeville, Wisconsin. Heldrich brought up the subject of plaintiff's blindness and said, "it must have been serious." Plaintiff agreed that it was, assured Heldrich that she had recovered, and then changed the subject.[16]

Finally, Heldrich told plaintiff that Borgida, Swift's Merchandising Manager, had been fired because of her "energy level."

■■■■ A hostile work environment exists when the workplace is permeated with discriminatory intimidation, ridicule, and insult sufficiently severe or pervasive to alter the conditions of the victim's employment. *Harris v. Forklift Systems, Inc.*, —— U.S. ——, ——, 114 S.Ct. 367, 370, 126 L.Ed.2d 295 (1993). Hostility is determined by looking at the totality of the circumstances, which may include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Id.* Psychological

---

**13.** Plaintiff immediately felt she had said something wrong.

**14.** Plaintiff again felt that she had said something wrong and did not want to pursue the topic further.

**15.** The point of plaintiff's complaint is not altogether clear because, from the Court's reading of her *deposition testimony*, all of Heldrich's comments were in a positive vein. According to plaintiff, he constantly referenced: "How pumped up I was. How active I was. How proactive I was. Was I in constant contact with the Lee Company. You know, how energetic I was with what I did."

Plaintiff admittedly perceived Heldrich as a "driven" individual, but she apparently interpreted his emphasis on energy and activity as "constant questioning" which her performance statistics did not justify. *Deposition of Karen A. Garcia-Paz* (Volume IV, August 3, 1994) at 430, 432. According to plaintiff, the constant references to her energy level were unnecessary, in light of her statistical performance, and prove that "[e]very day or every week [Heldrich] was pressuring me and pounding me and persecuting me about something," in an effort to make her "crack and quit." *Deposition of Karen A. Garcia-Paz* (Volume V, August 4, 1994) at 547.

**16.** According to plaintiff, the fact that Heldrich raised the topic created "an implication that he felt [she] was inadequate or unfit for job."

harm is a relevant but not necessary consideration. *Id.*

As a matter of law, the conduct which plaintiff has identified is not severe or pervasive enough to create an objectively hostile or abusive work environment—one which a reasonable person would find offensive. Mere snubs, unjust criticisms, and discourteous conduct are not actionable; to establish a hostile work environment, plaintiff must show that the alleged harassment is excessive, opprobrious, and more than casual conversation. *Cone v. Longmont United Hosp. Ass'n,* 14 F.3d 526, 531 (10th Cir.1994); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981); *Moore v. Norfolk & W. Ry. Co.,* 731 F.Supp. 1015, 1020 (D.Kan. 1990). On this record, a jury could not reasonably find that plaintiff's workplace was so permeated with retaliatory intent, ridicule or insult as to alter the conditions of her employment.

### E. Breach of Implied Contract of Employment

Plaintiff claims that defendant breached a contract in respect to the terms and conditions of her employment and in terminating plaintiff from her employment. Plaintiff alleges neither the existence nor terms of any express employment contract, and therefore must predicate this claim on an implied employment contract. Plaintiff therefore claims an "employment contract implied in fact," pursuant to which defendant agreed not to terminate plaintiff's employment except for cause (such as theft, dishonesty, disloyalty, or failure to achieve performance goals), and guaranteed that her employment would continue so long as the position was warranted and the performance goals had been achieved.

Kansas law governs this supplemental state law claim, and the Court ascertains and applies Kansas law in an effort to reach the same result that a Kansas court would reach. *See Adams–Arapahoe Sch. Dist. No. 28–J v. GAF Corp.,* 959 F.2d 868, 870 (10th Cir.1992). Kansas remains an employment-at-will state. *Berry v. General Motors Corp.,* 838 F.Supp. 1479, 1491 (D.Kan.1993).

The Kansas Supreme Court recently reiterated the controlling factors:

Where it is alleged that an employment contract is one to be based upon the theory of "implied in fact," the understanding and intent of the parties is to be ascertained from several factors which include written or oral negotiations, the conduct of the parties from the commencement of the employment relationship, the usages of the business, the situation and objective of the parties giving rise to the relationship, the nature of the employment, and any other circumstances surrounding the employment relationship which would tend to explain or make clear the intention of the parties at the time said employment commenced.

*Dickens v. Snodgrass, Dunlap & Co.,* 255 Kan. 164, 872 P.2d 252, 260 (1994) (quoting *Morriss v. Coleman Co.,* 241 Kan. 501, 738 P.2d 841 (1987)). The ultimate inquiry is whether the totality of the circumstances supports a finding that the parties objectively manifested an intent to alter the at-will employment relationship, and an employee's unilateral expectation of certain treatment will not suffice. *Berry,* 838 F.Supp. at 1492.

On these facts, however, plaintiff cannot prevail. Having concluded that plaintiff was physically unable to perform each material duty of her position after September 29, 1992, she cannot maintain an action for breach of contract arising from her termination. Plaintiff identifies no other colorable claim for relief, and defendant is therefore entitled to summary judgment on this claim.

### F. Intentional Infliction of Emotional Distress

Plaintiff claims that Swift intentionally inflicted emotional distress in its treatment of plaintiff during her employment and at the time of her termination.

Under Kansas law, a plaintiff claiming the tort of outrage, or intentional infliction of emotional distress, "must meet two threshold requirements by showing that (1) the defendant's conduct may reasonably be regarded as so extreme and outrageous as to

permit recovery; and (2) the plaintiff's emotional distress is so extreme and severe that no reasonable person should be expected to endure it." *Rupp v. Purolator Courier Corp.*, 790 F.Supp. 1069, 1073 (D.Kan.1992); *see also Bailey v. Kenney*, 791 F.Supp. 1511, 1527 (D.Kan.1992). As a matter of law, plaintiff cannot meet these requirements. First, the Court identifies no conduct that could be regarded as extreme and outrageous. Second, while plaintiff alleges exacerbation of her physical condition, she has neither alleged nor offered record evidence establishing that she suffered extreme and severe *emotional* distress.

### G. Negligent Infliction of Emotional Distress

 Kansas law has long held that there can be no recovery for emotional distress caused by the negligence of another unless accompanied by or resulting in physical injury. *E.g., Humes v. Clinton*, 246 Kan. 590, 598, 792 P.2d 1032, 1038 (1990); *Anspach v. Tomkins Industries, Inc.*, 817 F.Supp. 1499, 1509 (D.Kan.1993); *Payne v. General Motors Corp.*, 731 F.Supp. 1465, 1474 (D.Kan.1990). The purpose of the physical injury rule is to guard against fraudulent or exaggerated claims, *Maddy v. Vulcan Materials Co.*, 737 F.Supp. 1528, 1534 (D.Kan. 1990); it also recognizes that emotional distress is a common experience in life and is usually trivial, *Freeman v. Kansas State Network, Inc.*, 719 F.Supp. 995, 1001 (D.Kan. 1989).

 In this case, plaintiff's claim for negligent infliction fails as a matter of law because plaintiff has not alleged any negligent conduct. It should go without saying that in order to recover for negligent infliction of emotional distress, plaintiff must allege and prove negligent conduct by defendant. *Tyrrell v. The Boeing Co.*, 1994 WL 114841 (D.Kan.1994). In this case, plaintiff's complaints relate exclusively to intentional conduct, *i.e.*, harassment, persecution, criticisms, disparate treatment, and other intentional discrimination. The Court has carefully reviewed the record and finds no allegations of negligence and no evidentiary support for any such claim.

### Conclusion

Plaintiff is an obviously intelligent woman who has clearly worked hard and enjoyed substantial success in the business world. The Court has great sympathy for the circumstances in which she now finds herself. At the same time, in evaluating plaintiff's claims, the Court must be guided by evidence and not by sympathy. Legally, that evidence must rise above the level of suspicion and innuendo. It does not do so in this case and for reasons stated above, the Court believes that on this record a reasonable jury could not enter a judgment for plaintiff on any of the claims advanced.

**IT IS THEREFORE ORDERED** that *Defendant's Motion for Summary Judgment* (Doc. # 36) filed November 1, 1994, be and hereby is sustained.