**UNITED STATES COURT OF APPEALS**
**FOR THE FIFTH CIRCUIT**

_____

**No. 99-10330**
_____

**LLOLA TOTTY YOUNT,**

**Plaintiff-Appellant,**

**versus**

**S & A RESTAURANT CORP.,**

**Defendant-Appellee.**

_____

**Appeal from the United States District Court**
**for the Northern District of Texas**
**(3:96-CV-1400-D)**

_____

July 7, 2000

Before REAVLEY, DAVIS, and BARKSDALE, Circuit Judges.

PER CURIAM:[*]

The district court having granted Llola Totty Yount's former employer, S & A Restaurant Corp. (S & A), a FED. R. CIV. P. 50 judgment as a matter of law, following a jury verdict in Yount's favor, the linchpin of this appeal is whether she engaged in activity protected by the Americans with Disabilities Act (ADA), 42 U.S.C. § 12203(a). We **AFFIRM**.

_____

[*]Pursuant to 5TH CIR. R. 47.5, the Court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

S & A owns and operates several restaurant chains. Yount began her employment with S & A in 1987 as a waitress, and advanced in S & A's home office, receiving commendations and salary increases. In July 1994, Yount was recruited into S & A's Furniture, Fixtures and Equipment Department (FF&E) by its manager, Deanna Alder. When FF&E was reorganized shortly thereafter, Yount's duties as a "buyer" were altered; and Alder began reporting to John McLeod, Vice President of Field Support.

On 20 September 1994, Yount was diagnosed with recurrent major depressive disorder. The next day, she informed Alder of her condition and ongoing treatment.

In mid-October, feeling she was "just spinning [her] wheels" and "constantly behind" in her duties, Yount sought direction from Alder. Alder reviewed Yount's "Daytimer" (daily schedule), and told Yount it appeared she spent too much time in meetings. To assist Yount in prioritizing her projects, Alder suggested they have weekly "one-on-one" meetings.

It was not until 6 December that Alder criticized Yount's attendance or performance. Alder presented her then with a list of her absences and tardies for that year, indicating that Yount would be terminated if there was no improvement; and that McLeod agreed. Alder also mentioned other "areas of concern", including Yount's errors on business card orders, overscheduling meetings, and inability to prioritize.

Concerned about Alder's termination threat, Yount met with McLeod a week later, on 13 December. Yount informed him: Alder threatened her job because of various absences and tardies; she suffered from severe depression and was under psychiatric care, taking medicine and attending therapy; and she was doing all she could to get better. She also expressed her disagreement and confusion regarding Alder's methods of calculating her absences and tardies.

Within an hour of the Mcleod-meeting, an angry Alder approached Yount at her desk, and told her: not to go over her head again; "to be careful what [she] did"; and, later that day, she would meet with Yount to discuss what Young and McLeod had discussed.

At that later meeting, a still angry Alder stated: she planned to document, for Yount's personnel file, their previous conversations; and if Yount failed to improve her performance and eliminate her tardies and absences, she would be fired. Alder also asked about rumors Yount was interested in a job in another department, and stated no transfer would be allowed. The next day, Alder gave Yount a memorandum summarizing their meetings and conversations.

On 4 January 1995, Yount had an emotional breakdown. At Alder's suggestion, she went on short-term disability leave, during which her diagnosis was changed from depression to bi-polar disorder.

3

Yount returned to work on 23 January. The next day, Alder informed Yount that her employment was being terminated due to numerous projects she mishandled or left incomplete, discovered by Alder during Yount's leave.

In April 1996, Yount filed this action under, *inter alia*, § 503(a) of the ADA, 42 U.S.C. § 12203(a) (employer may *not* discriminate against employee for opposing act or practice made unlawful by ADA), claiming S & A terminated her employment in retaliation for her opposing Alder's job threat by meeting with McLeod on 13 December 1994. (The district court dismissed Yount's discrimination and accommodation claims in September 1997.)

In February 1999, a jury found that S & A had intentionally retaliated against Yount in terminating her employment. It awarded approximately $1.1 million in damages, including $750,000 in punitive damages. (Yount notes that, under applicable damage caps, the verdict would have been reduced to approximately $350,000, plus attorney's fees and costs.)

Concluding, as a matter of law, that Yount "did not prove she engaged in a protected activity and did not prove but-for causation", the district court granted S & A's Rule 50 post-verdict motion for judgment as a matter of law. It alternatively granted it a new trial.

II.

4

Yount maintains she produced sufficient evidence that her meeting with McLeod was both a protected activity and the cause of her termination.  She also contests the court granting a new trial.  Because Yount did *not* engage in protected activity, we do *not* reach the other issues.

For our *de novo* review of a judgment as a matter of law (JMOL), *e.g.*, **King v. Ames**, 179 F.3d 370, 373 (5th Cir. 1999),

> all of the evidence [is considered] ... in the light and with all reasonable inferences most favorable to the party opposed to the motion. If the facts and inferences point so strongly and overwhelmingly in favor of one party that the Court believes that reasonable men could not arrive at a contrary verdict, granting ... the motion[] is proper.  On the other hand, if there is substantial evidence opposed to the motion[], that is, evidence of such quality and weight that reasonable and fair-minded men in the exercise of impartial judgment might reach different conclusions, the motion[] should be denied ....

**Boeing Co. v. Shipman**, 411 F.2d 365, 374 (5th Cir. 1969) (en banc), *overruled on other grounds*, **Gautreaux v. Scurlock Marine, Inc.**, 107 F.3d 331 (5th Cir. 1997) (en banc).  *See* FED. R. CIV. P. 50; **Reeves v. Sanderson Plumbing Prods., Inc.**, __ U.S. __, 120 S. Ct. 2097, 2110 (2000) (court reviewing JMOL "should give credence to the evidence favoring the nonmovant as well as that 'evidence supporting the moving party that is uncontradicted and unimpeached, at least to the extent that that evidence comes from disinterested witnesses'") (quoting 9A C. WRIGHT & A. MILLER, FEDERAL PRACTICE AND PROCEDURE § 2529 (2d ed. 1995))).

5

Of course, in applying this standard, we examine the elements of a retaliation claim. When, as here, "a case has been fully tried on the merits, we no longer focus on the *McDonnell Douglas* burden-shifting rubric"; rather, our factual review is limited to whether "sufficient evidence ... support[s] the jury's ultimate finding of" retaliation. *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581, 588 (5th Cir. 1998), *reh'g en banc granted and opinion vacated*, 169 F.3d 215, *opinion reinstated*, 182 F.3d 333 (5th Cir. 1999). *See also Soileau v. Guilford of Maine, Inc.*, 105 F.3d 12, 16 (1st Cir. 1997) ("The ADA incorporates the procedures and enforcement mechanisms of Title VII."); *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997) ("Retaliation claims are treated the same whether brought under the ADA or Title VII.").

For unlawful retaliation, a plaintiff must show: "(1) engagement in an activity protected by the ADA, (2) an adverse employment action, and (3) a causal connection between the protected act and the adverse action". *Seaman v. CSPH, Inc.*, 179 F.3d 297, 301 (5th Cir. 1999); *e.g.*, *Long v. Eastfield College*, 88 F.3d 300, 304 (5th Cir. 1996).

The ADA provides, in relevant part: "No person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter...." 42 U.S.C. § 12203(a). Under this "opposition" clause, an employee is *not* required to make a formal complaint or show that the employer's

conduct was actually unlawful; she need only prove she had a "*reasonable belief* that the employer was engaged in unlawful employment practices". ***Payne v. McLemore's Wholesale & Retail Stores***, 654 F.2d 1130, 1140 (5th Cir. 1981 (emphasis added)).

On the other hand, the employee's statement of opposition *must* refer to an "allegedly unlawful" employment practice. ***Equal Employment Opportunity Comm'n v. Crown Zellerbach Corp.***, 720 F.2d 1008, 1013 (9th Cir. 1983). *See* ***Barber v. CSX Distrib. Servs.***, 68 F.3d 694, 702 (3d Cir. 1995) (general complaint of unfair treatment in employee's letter to management was *not* protected activity because it "d[id] *not* explicitly or implicitly allege that age *was the reason* for" such treatment (emphasis added)).

Therefore, "[t]he relevant question ... is *not* whether a formal accusation of discrimination is made but whether the employee's communications to the employer sufficiently convey the employee's reasonable concerns that the employer has acted or is acting in an *unlawful* discriminatory manner." ***Garcia-Paz v. Swift Textiles, Inc.***, 873 F. Supp. 547, 560 (D. Kan. 1995) (emphasis added) (opposition related to "personal grievance[s]" rather than unlawful employment practices is *not* protected activity).

Needless to say, whether an employee's statement or action is protected "opposition" is a fact-specific inquiry. *See* ***Sumner v. United States Postal Serv.***, 899 F.2d 203, 209 (2d Cir. 1990)

7

(noting opposition clause covers wide range of activities, including complaints to management); ***Dupont-Lauren v. Schneider (USA), Inc.***, 994 F. Supp. 802, 822 (S.D. Tex. 1998) (collecting cases finding protected opposition). Yount contends that, viewing her testimony in the light most favorable to her, and in the context of Alder's job threat based on absences and tardies Yount perceived to be symptomatic of her depression, a reasonable jury could conclude she had a good faith reasonable belief that Alder planned to terminate her *because of* her disability, *and* that Yount opposed such action in her meeting with McLeod. She asserts she explicitly alleged in her meeting with McLeod that her disability was the reason for Alder's job threat. S & A counters that Yount's testimony demonstrates she did *not* objectively and reasonably believe Alder's conduct was unlawful, and her merely informing McLeod about her depression was *not* in opposition; it was *not* a protected activity.

In short, because Yount's meeting with McLeod is when her claimed opposition took place, required is a review of her thoroughly covered, and re-covered, version about what occurred at that meeting:

> [**Direct Examination**]: Tell us what you recall about your meeting with Mr. McLeod.
>
> A: I went into his office and I told him that I appreciated him talking to me, that Deanna [Alder] and I had had a one-on-one the week before and that she had told me that she had spoken with him and that my job was in

8

jeopardy over my tardies and absences, and that *I wanted to talk to him to make sure that he understood everything that was going on, that I had been to a psychiatrist, that I was under therapy, that I was taking medication, that I was trying to get better and that I was trying to do my job to the best of my abilities.*

And he said, no, he had not been informed of that.

Then we went on to discuss the issues of ... when exactly are you [Yount] late and when exactly are you not late.

*I told him that it would concern me that she would put in writing something that could end up in my personnel file that said hours not worked when I was in meetings ...* for business for the company ... *and that these things concerned me, because I was doing everything that I could to try and do a good job, including going to her in the very beginning and telling her I was suffering from depression and also going to her later on and saying I need help getting my job done.*

....

[**Cross-Examination**]: Do you remember anything else that was said when you had your meeting with Mr. McLeod?

....

A: *I went to John McLeod to make sure that he was getting the same information that I was ... and to make sure that he had all the details on my side. I didn't expect him to do anything, except take into consideration what I was saying before I was – I lost my job.*

....

A:   ... [W]hen I went to John McLeod, *I was only trying to give him information. I wasn't trying to get any action taken.*

....

Q:   .... When you went to John McLeod, was there anything that Ms. Alder had just done to you that you thought was inappropriate or unfair?

A:   *I mean, inappropriate, unfair, no.*

Q:   Well, anything more serious than [whaat] she had just done to you?

A:   When she stated if I could not get rid of my excessive absences and tardiness my job was in jeopardy, and that she had talked to John McLeod, *it scared me and I thought I was in danger of losing my job.*

Q:   Did you think that that comment about getting rid of your excessive absences and tardyism was directed at your disability?

A:   *We had discussed that it was my disability that was my problem.*

....

Q:   ... What is it that you said to Mr. McLeod that you believe led to the company retaliating against you?

A:   *The only thing I can think of is that I gave him information that she had not [given him].*

....

[**Redirect Examination**]: Why did you go over [Alder's] head [to McLeod]?

A:   I went over her head because ... *I wanted to be sure that he understood that I was suffering from depression and I was seeking*

10

*medical help, that I was taking medication and that [Alder] and I had both discussed that some of those tardies and absences were related to my depression, and I felt as though if he understood that perhaps my job – he would be able to make an informed decision about what was going on.*

And he told me that, no, Deanna had not told him that I was suffering from depression.

....

Q: Did you believe that there was a relationship between your – any attendance and tardy problems that you were having and your disability?

A:    Yes.

Q:    And did you tell Mr. McLeod that?

A.    Yes.

Q:    Had you told Ms. Alder that?

A:    Yes.

Q:    Did you have any concern about whether or not Ms. Alder had communicated that to Mr. McLeod?

A:    Yes.

Q:    And is that one of the reasons that you talked to Mr. McLeod?

A:    Yes.

Q: What did you hope to accomplish by talking to Mr. McLeod about the relationship between your attendance and tardies and your disability?

A: *I wanted them to make an informed decision before I lost my job.*

....

11

Q:    At the time that you went to John McLeod, did you believe that Deanna Alder was unreasonably failing to take into account your disability in evaluating your absences and tardies?

A:    Yes.  I didn't think she was taking it into account.

....

[**Re-Cross Examination**]:  What should [Alder] have done by way of taking [Yount's depression] into account?

....

A:    I mean talking to me about it and asking me if I thought it was going to improve over the next however long and, you know, had it improved from a specific point to another point or had it gotten worse, instead of threatening my job.

Q:    Did you tell Mr. McLeod that you didn't think she was adequately taking it into account?

A:    *What I told Mr. McLeod was Deanna had told me my job was in jeopardy.*

....

Q:    And go ahead and tell us, as best you recall, what you told Mr. McLeod on the 13th.

A:    I told him that Deanna had told me that my job was in jeopardy because of my excessive absences and tardies and that she had told me that she had spoken to him about it and I was concerned because *I felt like if he knew that I was suffering from depression, that I was seeking therapy, that I was taking medication, that he would not have allowed her to do that.* I asked if she would – if she had informed him of that.

He said no.

12

> We then talked about some of my concerns and confusion over was I late at 8:30 or not. And, I mean, the discussion was that I felt as though my tardies and absences were related to my depression, was he aware of the depression when he was made aware of the excessive absences and tardies.
>
> And he said no.

(Emphasis added.)

As discussed, employees cannot be expected to voice their concerns about unlawful discrimination "with the clarity or precision of lawyers". *Garcia-Paz*, 873 F. Supp. at 560. Yount's characterization of her meeting with McLeod is belied, however, by her testimony. She repeatedly testified that she told McLeod about her depression so he could make an informed decision about her employment. There is *nothing* in the record to indicate she considered Alder's actions unlawful *or that she made such an allegation to McLeod*. Viewing the evidence in the light most favorable to Yount, a jury "could *not* logically infer that ... she was engaged in protected opposition to an unlawful practice or reasonably believed that she was so engaged". *Id.* at 560 (emphasis added).

### III.

For the foregoing reasons, the judgment is

*AFFIRMED*.

13