Bernard STEWART, Plaintiff,

v.

**BOARD OF COMMISSIONERS FOR SHAWNEE COUNTY,**
Kansas, Defendant.

**No. 00–4163–JAR.**

United States District Court,
D. Kansas.

Sept. 5, 2002.

---

41. *See Metzger v. City of Leawood,* 144 F.Supp.2d 1225, 1266 (D.Kan.2001).

Gene P. Graham, Jr., Mary E. Compton, White, Allinder, Graham Buckley & Compton, LLC, Independence, MO, for Plaintiff.

Ron D. Martinek, Parker & Hay, LLP, Topeka, KS, for Defendant.

### *MEMORANDUM OPINION AND ORDER DENYING PLAINTIFF'S MOTIONS TO STRIKE AND GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION FOR SUMMARY JUDGMENT*

ROBINSON, District Judge.

This employment discrimination action comes before the Court on defendant's Motion for Summary Judgment (Doc. 110) and plaintiff's Motions to Strike (Doc. 115, 116 and 117). Plaintiff Bernard Stewart seeks relief under 42 U.S.C. § 1981 for racial discrimination in failure to promote plaintiff to three positions he applied for, for disparate pay and other conditions of employment, and for a hostile work environment. The Court denies Stewart's motions to strike. Because the Court concludes that Stewart has failed to satisfy his light burden of showing, at the prima facie stage, that he was minimally qualified for the Recyclable Driver/Collector position, the Court grants the Defendant summary judgment on Stewart's claims of failure to promote to this position. The Court concludes that there are material issues of fact concerning whether Defendant's stated reasons for not promoting Stewart to the other two positions are pretextual, and thus the Court denies Defendant's motion for summary judgment on Stewart's claim for failure to promote to Golf Course Maintenance II and Park Maintenance II. Because Stewart makes no showing that he was subjected to discriminatory tests that precluded his ability to be promoted, the Court grants summary judgment on that claim; the Court grants summary judgment on the disparate pay claim for lack of any evidence supporting that claim. Finally, the Court concludes that the incidents of racially offensive comments to Stewart were not sufficiently severe and pervasive to create a hostile work environment as a matter of law.

## I. FACTUAL RECORD UNDER CONSIDERATION

■ The following facts are taken from the summary judgment record and are either stipulated, uncontroverted or viewed in the light most favorable to Stewart's case. The Court ignores factual as-

sertions that are immaterial, or not supported by affidavits and/or authenticated and admissible documents. The Court also disregards conclusory statements and statements that are conclusions of law rather than statements of fact. The Court further disregards those portions of the affidavit of Stewart and Doug Stuewe that directly contradict their prior deposition testimony; the Court does not find that the affidavits are a "sham" with respect to information that serves to clarify, explain or correct prior misstatements.[1]

The Court notes that although in his statement of controverted facts Stewart repeatedly refers to documents that Defendant did not allow him to discover, the record reveals no attempt by Stewart to bring any such discovery dispute to the Court's attention until now. The record also shows that defendant signed a certificate dated May 29, 2001 that it had produced the documents in Stewart's fifth request for production. In light of Stewart's failure to follow the rules of procedure governing discovery and discovery disputes, the Court cannot countenance Stewart's excuses for a spotty record at this time.

■ The Court further notes that Stewart has filed a Motion to Strike three pieces of evidence: 1) the Minimum Qualifications Chart prepared by David Bartels ( ¶¶ 40–42); 2) a memo from David Bartels to John Knight dated 8/8/00, in response to Stewart's union grievance (¶ 49 and Exhibit Tab 36); and 3) a letter dated August 30, 2000 from Bartels to Stewart regarding follow up of Stewart's complaint regarding other employees (¶ 114 and Tab 16). Because in the Amended Pretrial Order the parties stipulated to the admission of each of these exhibits, the Court denies Stewart's Motion to Strike.

## II. UNCONTROVERTED FACTS

Plaintiff Bernard Stewart, an African American man, was hired by the Defendant, the Shawnee County Parks and Recreation Department, on July 27, 1998 for the position of Park Maintenance I. Later, Stewart unsuccessfully applied for other positions in the Parks and Recreation Department. Stewart brings three claims for failure to promote, based on three of the positions he unsuccessfully applied for: 1) in April 1999, he applied for the position of Golf Course Maintenance II; 2) in November 1999, he applied for the position of Recyclable Material Collector/Driver; and 3) in July 2000, he applied for the position of Park Maintenance II. In addition to the three failure to promote claims, Stewart claims disparate treatment and employment conditions, including disparate pay and discriminatory testing that precluded him from advancement or promotion. He further claims that he was subjected to a hostile work environment.

On October 4, 2000, Stewart filed this lawsuit. In January 2001, Defendant implemented a trainee program designed to give employees skills and experience that would qualify them for advancement in the department. The training program was available to employees in Park Maintenance I and other positions. Stewart participated in the trainee program, passed a test given at the completion of the program, and in March 2001 Stewart was promoted to Park Maintenance II.

### Hostile Work Environment

Stewart complains of four specific incidents that occurred between February

1. See *Rios v. Bigler*, 67 F.3d 1543, 1551 (10th Cir.1995).

2000 and March 8, 2000. In the first incident, a co-worker, Larry Jacobia, told Stewart that Stewart should use a wire brush on his hair. Stewart did not report this comment to his supervisor, but told Jacobia the comment was offensive. Jacobia apologized and has never acted in this offensive way again.

The other three incidents involved another co-worker, Art Meredith. Meredith and Stewart did not work at the same location, but occasionally encountered each other. In the first Meredith incident, Meredith remarked, while looking at a photograph of Stewart, "If you would smile, I would be able to see you." Stewart testified that John Knight, the Director of the Shawnee County Parks and Recreation Department, and several other employees were present during Meredith's comment. Knight denies hearing Meredith say this. Stewart testified that he did not report Meredith's conduct to anyone, because he thought John Knight should take care of it.

In the second Meredith incident, a soda machine in the employees' lunchroom released a can of soda despite no money being put in the machine. Meredith remarked to Stewart, "I know about you black guys. You black guys will steal a person's billfold, then go apply for welfare." Stewart testified that Bob Hester, who was Stewart's foreman, then agreed with the comment and said: "Yeah, a black guy will." Hester denies making this statement. Stewart then reported the first and second Meredith incidents to Doug Stuewe, a union steward. Stuewe testified that he intended to investigate these incidents, but before he could accomplish that, Stewart told him about a third incident with Meredith.

In the third Meredith incident, in front of a lunchroom full of employees, Meredith said to Stewart, "[y]ou are the first Black Jew I have ever seen," a comment that elicited laughter from the other employees. Stewart made a formal complaint to Lyle Bausch, the Park Superintendent. Bausch discussed the incident with John Knight. An investigation was conducted by Bausch, Knight, along with David Bartels, the Park Facilities Superintendent and John Puff, a union steward. They determined that Meredith had made the comment. The following Monday, four days after the incident, Meredith was fired for making the comment.

Stewart had two arguments with Bob Hester, the foreman, about work assignments. In April 2000, Stewart and Hester exchanged foul language as they argued about a work assignment. Hester made no racially offensive comments, but he cursed at Stewart. Stewart told Hester that Hester was not a man and did not earn his money. Stewart asked for and was granted permission to go home early that day. Later, David Bartels admonished Stewart; John Knight admonished Hester about this incident.

In August 2000, Stewart and Hester had another disagreement about Hester assigning Stewart to mow some bluegrass. Hester gave in, and assigned the work to someone else. David Bartels investigated the incident and issued a written reprimand to Stewart for insubordination. Bartels met with Stewart to discuss the reprimand. Brad Puff, a union steward who witnessed the meeting, stated that Stewart yelled at both Bartels and Hester in the meeting.

Stewart testified that in another incident, Hester told a co-worker that they were ready to take a break, but ignored Stewart and did not direct the statement to Stewart even though he was present.

Stewart further testified that every time he complained or "vented" to Dave Bartels about the way Hester was treating him, Bartels responded by reprimanding Stewart. Doug Stuewe, a union steward, testified that Stewart could be difficult and tended to fly off the handle and particularly had trouble getting along with Dave Bartels.

### Disparate Pay

Stewart is a permanent employee of Defendant and a member of the Teamsters Local Union No. 696. Stewart is covered by the "Master Agreement." This union contract includes a wage scale and Stewart was paid accordingly. Stewart has presented no evidence that others in the position of Park Maintenance I with his time of service were paid more than he was.

### Failure to Promote–Golf Course Maintenance II

On April 13, 1999, Stewart applied for the position of Golf Course Maintenance II. The job announcement had six sections: "Definition"; "Example of Duties"; "Required Knowledge, Abilities and Skills"; "Training and Experience"; "License"; and "Special Requirements." The "Required Knowledge, Abilities and Skills" section stated:

> Knowledge of materials, methods and techniques commonly used in golf course maintenance and construction activities.

> Ability to establish and maintain cooperative work relations with those contacted in the course of work; ability to understand and carry out written and oral instructions.

The "Definition" section of the job announcement for the Golf Maintenance II position stated:

> Under immediate supervision, performs a variety of grounds keeping, tree and golf course maintenance duties; operates hand and power equipment; performs unskilled work of routine difficulty in construction, maintenance, and repair; performs related work as required.

The "Example of Duties" section of the job announcement for the Golf Course Maintenance II position stated:

> Operates golf course vehicles and mowing equipment; empties trash containers, changes greens cups and tee markers; performs irrigation system repairs, lays sod and spreads fertilizer; prunes and plants trees/shrubs; inspects and maintains golf course equipment; rakes and reconditions sand traps; performs general grounds maintenance work including repair of golf course structures; operates hand and power tools and other equipment to maintain the golf course.

Finally, the "Training and Experience" section of the job announcement for the Golf Course Maintenance II position stated:

> High school diploma or GED and physical ability to do the work. At least one year of golf course maintenance experience preferred.

Stewart denies ever receiving a copy of this job description. Stewart submitted a job application that provided the following information about his skills and experience:

(1) Under "Skills and Qualifications" "I can operate some golf course vehicles and mowing equipment."

(2) His prior work experience consisted of three jobs: the current Park Maintenance I position, where his duties were maintenance on picnic table, paddle boats, lawn, ect [sic]; a "special event

person" for the State Historical Society where his duties were "setup and take down for special event, and some cleaning;" and a "control room operator" for K.P.L. where his duties were "control boiler & turbine and read guages [sic]."

The interview was conducted by Tom Opat, the Golf Course Superintendent, who also made the hiring decision. Opat followed an outline of interview topics and questions, and asked Stewart and the six other applicants about their experience in a variety of construction related areas: welding, concrete work, plumbing, carpentry, electrical, and operating heavy equipment. Opat also asked them about their experience in landscaping, including using railroad ties, native rock, landscape timbers and design. He also asked them about their knowledge of irrigation, including installation, trouble shooting and repair of sprinkler systems. Opat also asked them about their golf course experience, including playing golf.

Opat hired Robert Sleep, another Park Maintenance I employee of Defendant. Stewart started working for Defendant five days before Sleep started. Section 9.1 of the union contract stated that "the employee with the most departmental seniority and meeting the minimum qualifications shall be promoted."

Opat decided that Stewart did not meet the qualifications because Stewart had low skills in electrical, plumbing and landscaping, had limited knowledge and experience in the construction field, and lacked enthusiasm for the Golf Course Maintenance II position. Stewart testified that Opat failed to record much of the skills and experience that Stewart told him about during the interview, including experience in concrete, plumbing, landscaping, carpentry, electrical, and welding.

Opat decided that Sleep met the qualifications because Sleep had basic knowledge in the construction field and had medium skills in carpentry, welding, concrete work, and operating a uniloader. Sleep also had experience playing golf. In fact, Sleep's application stated under "Skills and Qualifications" "I can operate an 88, an HR15, a weedeater, and I play golf all the time and would do anything too [sic] make the course more enjoyable for all golfers." Opat also determined from Sleep's application and interview that Sleep had experience operating a pump truck.

While acknowledging that the primary job responsibilities were grounds maintenance, mowing and raking bunkers, Opat testified that since his small staff serviced two golf courses, they were stretched thin, requiring people with the ability to do multiple projects because "[w]e get stretched to the limit as far as people with skills and carpentry or welding or concrete or whatever." Opat testified that his staff is responsible for all the structures on a golf course and handle most of the work, be it construction, electrical, plumbing or more, in house.

Archie Larkin, the only African American employed in the Golf Course Maintenance II position, stated that in the 23 years that he has been in the position, 95% of his duties and responsibilities have been directly related to upkeep of the golf course: mowing fairways, rough, greens, green banks and tee boxes, and maintaining bunkers and general grounds. Larkin stated that only 5% of the job involved labor requiring skills in smoothing concrete and operating a track loader. Larkin stated that in 23 years he has never been asked to do welding, plumbing, electrical work (other than changing light fixtures) or carpentry. He further testified

that only the "mechanic" does welding, and that no other Golf Course Maintenance II employees do welding.

### Failure to Promote–Recyclables Collector/Driver

In November 1999, Stewart applied for a Recyclable Material Collector/Driver position in the Shawnee County Recycling Department. The job announcement for the position had five sections: "Definition;" "Example of Duties;" "Required Knowledge, Abilities and Skills;" "Education, Training and Experience;" and "Special Requirements." The "Required Knowledge, Abilities and Skills" section stated:

> Considerable knowledge of waste recycling, hazardous material handling and equipment used in recycling.

> Ability to operate refuse Class A vehicle truck, ability to follow and carry out oral and written instructions; ability to read and understand household hazardous disposal requirements; ability to perform moderate to strenuous physical labor.

The "Special Requirements" section of the job announcement stated:

> Possession of a valid Class A State of Kansas vehicle operator's license with HAZ–MAT endorsement. Hiring is conditional upon passing drug/alcohol testing as required per the Union Contract.

The "Education, Training and Experience" section of the job announcement advises that it is preferred that the applicant have completed an OSHA course, or obtain a certificate within six months of hire and be certified for respirator usage within six months of hire. There is no mention in this section that the Class A driver's license with HAZ–MAT endorsement could be obtained during some period after hiring.

Stewart was not interviewed for the position. Stewart did not possess a Kansas vehicle operator's license with a HAZ–MAT endorsement. Eddie Spencer was hired for the position. Spencer did possess the requisite operator's license with HAZ–MAT endorsement. Although Stewart asserts that Spencer did not have such a license, Stewart does not support this assertion with any reference to the record.

### Failure to Promote–Park Maintenance II

In July 2000, Stewart applied for the position of Park Maintenance II. The job announcement had six sections: "Definition;" "Example of Duties;" "Required Knowledge, Abilities and Skills;" "Education, Training and Experience;" "Licenses"; and "Special Requirements." The "Required Knowledge, Abilities and Skills" section included these requirements:

> Knowledge of equipment, materials, methods, and techniques used in the construction and maintenance of park facilities.

> Good skills in operating all park maintenance equipment and machinery.

At the time Stewart applied for this position, he had been working in the Park Maintenance I position for about two years. The job announcement for Park Maintenance I also required "Knowledge of equipment, materials, methods, and techniques used in the construction and maintenance of park facilities." But the Park Maintenance I position did not require "[G]ood skills in operating all park maintenance equipment and machinery," as the Park Maintenance II position required.

There were other differences between the Park Maintenance II and Park Mainte-

nance I job announcements. "Examples of Duties" for the Park Maintenance II position, but not for the Park Maintenance I position were:

Operates backhoes, track loaders, uniloaders, trash trucks, boom trucks, dump trucks, mowers and various other equipment used in the construction and maintenance of park facilities.

Performs a variety of repairs to Parks and Recreation buildings and facilities, athletic complexes, community centers, pools, playgrounds, docks, new construction, etc.

Performs a variety of skilled and semiskilled tasks in the maintenance, repair and construction of park and recreation facilities; performs carpentry, masonry, painting, plumbing, welding, concrete and electrical tasks of the skilled craft worker level.

In addition, the Park Maintenance II position had a license requirement that the Park Maintenance I position did not have, to wit: "A Commercial Driver's License (CDL) issued by the Kansas Department of Motor Vehicles is required by the end of the probationary period."

Stewart and four other persons were interviewed by Dave Bartels, Lyle Bausch and Julie Towbridge, the Horticulturist. Bob Hester, the Park Maintenance foreman who assigned work to those in Park Maintenance I and II positions, was not involved in this hiring decision, as he has no authority to hire, fire or discipline employees. The interviewers did not hire Stewart for the position. Instead, they hired Peter Espinoza, a Hispanic male, who did not work for the Parks and Recreation Department.

During the interview, applicants were asked to identify their skills in leadership, carpentry, masonry, plumbing, welding, concrete, electrical, equipment, communication, and motivation. The interviewers noted that Stewart's skills included the following:

Carpentry skills: Simple things. Dog House. Read a ruler. Floor porta john.

Masonry skills: job corps-brick laying, cinder blocks

Plumbing skills: sweat pipe, thread pipe/copper pipe, can install irrigation

Concrete skills: some finishing skills, no forming, 45th street work, no slope, trail

Welding skills: none, hasn't welded

Electrical skills: ceiling fan, switches, light switch, home skills

Equipment skills: forklift, tractor, all mowers, weedeater, trimmer, chainsaw, skidloader, but no dump truck and no backhoe

The interviewers summarized their reasons for not hiring Stewart as, "[D]oesn't meet qualifications. No welding, low attitude, low equipment skills, carpentry weakness, electrical low, concrete finishing-doesn't forming or process." In an affidavit signed after his deposition testimony on this subject, Stewart stated that the interviewers failed to accurately evaluate the level of his skills, and misrepresented his response to various interview questions, which Stewart does not identify.

Espinoza, the person hired, had experience that included such duties as "install, repair and maintain cities [sic] water supply systems, heavy excavation work plumbing, jack hammers, compressors, pumps, generators, most gas powered tools and elec. hand tools." The interviewers' notes on Espinoza were as follows:

Carpentry skills: frame, skill saws

Masonry skills: catch basin repair, water dept.

Plumbing skills: none/tap mains, meter install

Concrete skills: sidewalks, curbs, some experience

Welding skills: wire fed, arc

Electrical skills: weak point

Equipment skills: operated river mowing, dump truck, tamper, tractors, chainsaws, boom truck, vaccum [sic] truck, pumps, storm drain cleaner

The interviewers summarized their reasons for hiring Espinoza as, "[d]emonstrated good use of equipment judgement in interview. Has done framing, masonry, painting, water meter installs, copper, pvc, welding, arc, wire feed, concrete sidewalks. Electrical weak point. Able to read plans. Personable attitude."

A chart summarizing the interviews of Espinoza and Stewart compares the two as follows. Espinoza had experience operating a backhoe, uniloader, boom truck and dump truck but no experience operating a trackloader and a trash truck; Stewart had experience operating a uniloader, but no experience operating a backhoe, trackloader, trash truck, boom truck or dump truck. Espinoza had welding experience; Stewart did not have welding experience. They both had experience in masonry, painting, plumbing, carpentry and concrete, but Espinoza had more skill and experience in carpentry than Stewart (building sheds and framing versus building dog houses and rebuilding a portajohn). Espinoza also had more skill and experience working with concrete than did Stewart (water proofing, forming, foundation, finishing, floating versus finishing only).

Stewart filed a grievance about not getting this promotion. Doug Stuewe, a union steward, investigated and determined that Stewart lacked the necessary skills for the Park Maintenance II position, but could acquire these skills within a 60–day probationary period. In an affidavit dated December 12, 2001, given after his deposition testimony, Stuewe stated that he had changed his position about Stewart not being qualified for the Park Maintenance II position, based on his review of documents concerning the interviews and hiring of Park Maintenance II employees prior to Stewart's application. Stuewe noted that Defendant did not provide most of these documents to him although he requested all pertinent documentation; Stuewe only gained access to these documents after they were discovered by Stewart in the instant lawsuit.

Before he changed his position about Stewart meeting the minimum qualifications, in a letter dated September 12, 2000, Stuewe suggested to John Knight that training opportunities be made available to employees in Park Maintenance I positions to gain the skills for advancement to Park Maintenance II, and that the union and Stewart would consider Stewart's grievance settled if the Defendant would agree to implement such a training program.

On October 4, 2000, Stewart filed the instant lawsuit. Knight responded to Stuewe in a letter dated October 5, 2000, stating that the department had begun planning some in-house training opportunities for all employees, including those in the Park Maintenance I position. On December 18, 2000, Knight issued a memo regarding implementation of a trainee program to improve recruitment, selection and retention of employees, and give promotional opportunities to current employees.

The trainee program was implemented in January 2001. Stewart received training in welding, operating a backhoe and skidloader, and was also taught certain mathematical equations for working with lumber and concrete. As required under the trainee program, Stewart took an examination at the end of the training, passed and was then promoted effective March 2001. Stewart testified that the test questions were fair and that he felt competent to answer the questions.

In an affidavit dated December 12, 2001, given after Stewart's deposition testimony, Stewart called the trainee program and testing a farce; and said he had not received training in anything he did not already know, other than being given one opportunity to train on a welder. Stewart said he would have passed the test without any training.

## III. DISCUSSION

### *Summary Judgment Standard*

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is enti-tled to judgment as a matter of law."[2] A factual dispute is "material" only if it "might affect the outcome of the suit under the governing law."[3] An issue of fact is genuine if the evidence is sufficient for a reasonable jury to return a verdict for the nonmoving party.[4] The moving party bears the initial burden of showing that there is an absence of any genuine issue of material fact.[5] Once the moving party meets its burden, the burden shifts to the nonmoving party to demonstrate that genuine issues remain for trial "as to those dispositive matters for which it carries the burden of proof."[6] The nonmoving party may not rest on its pleadings but must set forth specific facts.[7] The court must consider the record in the light most favorable to the party opposing the motion.[8] The court determines "whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law."[9] In making such a determination, the court should not weigh the evidence or credibility of witnesses. In determining whether any genuine issues of material fact exist, the court must construe the record liberally in favor of the party opposing summary judgment.[10] If an inference can be deduced from the facts that would allow the nonmovant to prevail,

**2.** Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Vitkus v. Beatrice Co.*, 11 F.3d 1535, 1538–39 (10th Cir.1993).

**3.** *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

**4.** *Id.* at 248, 106 S.Ct. 2505.

**5.** *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Hicks v. City of Watonga, Okl.*, 942 F.2d 737, 743 (10th Cir.1991).

**6.** *Applied Genetics Intern., Inc. v. First Affiliated Securities, Inc.*, 912 F.2d 1238, 1241 (10th Cir.1990) (citing *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548).

**7.** *Id.*

**8.** *Bee v. Greaves*, 744 F.2d 1387, 1396 (10th Cir.1984), *cert. denied*, 469 U.S. 1214, 105 S.Ct. 1187, 84 L.Ed.2d 334 (1985).

**9.** *Anderson*, 477 U.S. at 251–52, 106 S.Ct. 2505.

**10.** *McKibben v. Chubb*, 840 F.2d 1525, 1528 (10th Cir.1988) (citation omitted).

summary judgment is inappropriate.[11]

### Hostile Work Environment

 In order to survive summary judgment on his hostile work environment claim, Stewart must show that under the totality of the circumstances, the harassment was pervasive or severe enough to alter the terms, conditions, or privileges of employment, and that the harassment was based on or stemmed from his race.[12] In addition, Stewart must be able to point to "more than a few isolated incidents of racial enmity." [13] Harassment must be sufficiently severe or pervasive, and the court should consider all of the circumstances, including:

> the frequency of the discriminating conduct; its severity; whether it is physically threatening or humiliating or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.[14]

Stewart contends that the racial slurs of two co-workers, Larry Jacobia and Art Meredith, created a hostile work environment. Larry Jacobia uttered an offensive comment to Stewart on one occasion, telling Stewart that he should use a wire brush on his hair. Stewart testified that after telling Jacobia that the comment was offensive, Jacobia apologized and never uttered a racially offensive comment again. The other co-worker, Art Meredith, did not work at Stewart's location, but nevertheless had sufficient contact with Stewart to utter racist comments to him. Stewart stated that when he and Meredith worked at the same location in the past, he had similar problems with Meredith, but could only recall three specific occasions, all of which occurred within the span of several weeks in February and March 2001.

Stewart testified that during these several weeks in 2001, Meredith commented: 1) that if Stewart would have smiled, he would have been seen in a photograph; 2) "I know about you black guys. You black guys will steal a person's billfold then go apply for welfare"; and 3) that Stewart was a black Jew. Meredith's first comment was uttered in the hearing of John Knight, according to Stewart, which Knight denies. The second comment was uttered in front of Bob Hester, who, according to Stewart, agreed, saying "yes, a black guy will." Hester denies making this statement. In the third incident, Meredith called Stewart a black Jew in front of a lunchroom full of employees.

Clearly, the conduct of Meredith and Jacobia was racial harassment. However, as co-workers with no supervisory authority over Stewart, they had no ability to alter the terms or conditions of his employment; and Stewart does not contend that Meredith and Jacobia's conduct did alter the terms, conditions or privileges of his employment. Stewart found these comments humiliating and offensive, but testified at his deposition that none of these incidents precluded him from performing his work duties.

In an affidavit given after his deposition testimony, Stewart stated that he was af-

---

11. *United States v. O'Block,* 788 F.2d 1433, 1435 (10th Cir.1986) (citation omitted).

12. *Vigil v. City of Las Cruces,* 113 F.3d 1247 (10th Cir.1997) (citing *Bolden v. PRC Inc.,* 43 F.3d 545, 551 (10th Cir.1994), *cert. denied,* 516 U.S. 826, 116 S.Ct. 92, 133 L.Ed.2d 48 (1995)).

13. *Id.* (citing *Hicks v. Gates Rubber Co.,* 833 F.2d 1406, 1412 (10th Cir.1987))

14. *Faragher v. City of Boca Raton,* 524 U.S. 775, 118 S.Ct. 2275, 141 L.Ed.2d 662 (1998).

fected by this conduct, suffering shame and discomfort, causing him to have to leave work early one day. Although the Court is charged to view the evidence in the light most reasonable to Stewart, the Court notes that Stewart's affidavit specifically contradicts his earlier deposition testimony that the discrimination did not impair his ability to work. The Court will not countenance Stewart's later attempt to change this deposition testimony.

■ In order to hold Defendant liable for the racially discriminatory comments or conduct of non-supervisory employees, like Meredith and Jacobia, Stewart must prove that Defendant knew or should have known of the harassment and failed to take prompt and effective remedial action.[15] Stewart admits that he did not report Jacobia's comments to anyone; and that while he reported Meredith's comments to union steward Doug Stuewe, until the third and final incident with Meredith, Stewart did not report any of Meredith's conduct to management. Stuewe testified that he intended to investigate Stewart's reports about Meredith, but since the three incidents happened in quick succession over the course of just a few weeks, Stuewe had not yet investigated them. However, the third incident was immediately reported to John Knight, and in a matter of a few work days, other employees who witnessed the incident were interviewed, and Meredith was terminated.

Stewart claims that Defendant knew about the first Meredith incident because John Knight was present and heard Meredith's offensive comment. Stewart further claims that Defendant knew or should have known about the second Meredith incident because Hester was present and in fact participated in the racist comment. Knight's knowledge and Hester's participation are issues of fact. But, even if true, establishing that Defendant either knew or should have known about the racial harassment from the time of the first Meredith incident, the record still shows that Defendant took prompt action. The Meredith incidents happened so quickly that Doug Stuewe did not have time to investigate the first two incidents, by March 8, 2000, when the third incident occurred. Although Stewart cannot recall the exact dates of the first and second Meredith incidents, he agrees that these two incidents occurred between sometime in February and sometime before March 8, 2000. The Defendant, within four days of the March 8 incident, and with two of those being weekend days, investigated and determined that Meredith had made the racist comment. And, the Defendant then took effective remedial action, terminating Meredith.

■ Stewart also complains that his foreman, Bob Hester, as well as their supervisor, David Bartels, criticized Stewart's job performance more harshly than other similarly situated employees were criticized. When Stewart asked Hester questions, Hester responded by cursing at Stewart. And, whenever Stewart "vented" his frustration to Bartels, he reprimanded Stewart.

Stewart had a rocky relationship with Hester and Bartels. In one incident, Stewart belittled Hester's work, telling him he wasn't a real man. In April and August 2000, Stewart and Hester cursed each other during a discussion about work

---

**15.** *Freeman v. Kansas,* 128 F.Supp.2d 1311, 1322 (D.Kan.2001)[citing *Hirschfeld v. New* *Mexico Corrections Dept.,* 916 F.2d 572, 577 (10th Cir.1990) ][additional citations omitted].

Hester had assigned to Stewart. Stewart admits that he questioned the propriety of Hester assigning Stewart to mow some bluegrass, and that Hester ultimately did not require him to do that mowing. Bartels investigated the incident and reprimanded Stewart for insubordination and Hester for using abusive language. When Bartels attempted to explain the reprimand to Stewart, Stewart responded by yelling at Bartels and Hester.

■ Stewart also felt slighted by an incident when Hester told another employee when they would take a lunch break, yet did not address the same comment to Stewart even though Stewart was standing there. But, as this Court noted in *Garcia–Paz v. Swift Textiles, Inc.*[16] "[m]ere snubs, unjust criticisms, and discourteous conduct are not actionable; to establish a hostile work environment, plaintiff must show that the alleged harassment is excessive, opprobrious, and more than casual conversation."[17]

### Disparate Pay

Stewart claims that he was discriminated against in the terms and conditions of his employment, specifically being paid less than others and being subjected to more harsh and frequent criticism. In considering a disparate treatment claim, the court is bound by the burden-shifting framework set out in *McDonnell Douglas Corp. v. Green.*[18]

■ To state a prima facie case of discrimination under § 1981, Stewart must show: (1) he was a member of a protected class; (2) he experienced adverse employment action; and (3) similarly situated non-minorities were treated more favorably.[19] Stewart fails to establish a prima facie case of disparate or unequal pay. He offers no evidence that he was paid less than similarly situated non-minority employees. Indeed, the record shows, and Stewart does not dispute, that as a permanent employee and member of the Local Union, Stewart was paid an hourly wage determined by the union contract, based on his seniority. His pay was the same as any other employee who had been hired at the same time and was in the same position.

### Failure to Promote

Defendant moves for summary judgment on Stewart's claims that Defendant violated § 1981 by failing to promote him to three positions: (1) the Golf Course Maintenance II position; (2) the Recyclable Collector/Driver Position; and (3) the Park Maintenance II position. Included in these claims is Stewart's claim that Defendant engaged in discriminatory testing practices that denied him promotion or opportunity. Although Stewart asserts in the Amended Pretrial Order that because of racial discrimination he was not interviewed for a custodian position with the Department of Corrections and a Bridge Maintenance Worker position with the Public Works Department, Stewart does not include these positions in his failure to

16. 873 F.Supp. 547, 561–562 (D.Kan.1995).

17. *Id.* (citing *Cone v. Longmont United Hosp. Ass'n.* 14 F.3d 526, 531 (10th Cir.1994)); *Johnson v. Bunny Bread Co.,* 646 F.2d 1250, 1257 (8th Cir.1981); *Moore v. Norfolk & Western Ry. Co.,* 731 F.Supp. 1015, 1020 (D.Kan. 1990).

18. 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973).

19. *Bullington v. United Air Lines, Inc.,* 186 F.3d 1301, 1315–16 (10th Cir.1999); *Watson v. Lucent Technologies, Inc.,* 92 F.Supp.2d 1129, 1135 (D.Kan.2000)

promote or any other claim.[20]

■ *McDonnell–Douglas*[21] provides a three-step, burden-shifting process by which to evaluate a plaintiff's claims. First, a plaintiff must establish a prima facie case of discrimination.[22] To establish a prima facie case of discriminatory failure to promote, plaintiff must show that (1) he is a member of a minority group, (2) he was qualified for the promotion, (3) he applied for the position at issue, (4) he was not promoted, and (5) the position was filled or remained open after his application.[23]

### A. Failure to Promote–Golf Course Maintenance II

■ At issue is whether Stewart has established a prima facie case by showing that he was qualified for the Golf Course Maintenance II position. Not only is this an element of Stewart's prima facie case, the union contract required that Defendant hire the employee with seniority in the department if the employee met the minimum qualifications of the job. Stewart had seniority over the person hired, Robert Sleep.

■ The minimum qualifications for the position are those set out as "Required Knowledge, Abilities and Skills" in the job announcement, "[k]nowledge of materials, methods and techniques commonly used in golf course maintenance and construction activities." "Materials, methods and techniques" that are "commonly used" are subjective types of criteria, particularly since the interviewing and hiring process did not include any method of testing whether an applicant had such knowledge. As the Tenth Circuit noted in *Burrus v. United Tel. Co. of Kansas*,[24] a defendant should not be able to defeat a plaintiff's prima facie showing with subjective qualifications, because that would deny the plaintiff an opportunity to prove that those subjective criteria were pretextual, a means to effect a discriminatory action.

■ The burden of establishing a prima facie case is light, such that plaintiff can establish that he is qualified for the position, by presenting credible evidence, including his own testimony, that he was qualified, even if the employer disputes that.[25] Stewart has met this light burden, through his own testimony that he was qualified, through his park maintenance and landscaping experience, and his knowledge of how to operate golf course vehicles and mowing equipment.

■ The burden then shifts to Defendant to state legitimate, non-discriminato-

---

**20.** Even if Stewart included these positions in his claims for failure to hire or promote, he fails to establish a prima facie case. He was not minimally qualified for the Bridge Maintenance position because he had no experience in bridge construction or maintenance. He was not minimally qualified for the custodial position, because he had a felony conviction, which he failed to disclose during the application process.

**21.** 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668.

**22.** *Id.* at 802, 93 S.Ct. 1817.

**23.** *See Bennett v. Quark, Inc.,* 258 F.3d 1220, 1228 (10th Cir.2001); *Amro v. Boeing Co.,* 232 F.3d 790, 796 (10th Cir.2000) (noting *Kendrick v. Penske Transp. Servs., Inc.,* 220 F.3d 1220, 1229 (10th Cir.2000) rejected the requirement that plaintiff must allege the position was filled by someone outside of plaintiff's protected class).

**24.** 683 F.2d 339, 342 (10th Cir.1982).

**25.** *See Kenworthy v. Conoco, Inc.,* 979 F.2d 1462, 1469–70 (10th Cir.1992).

ry reasons for failing to promote Stewart to this position.[26] Defendant satisfies its burden by stating that Stewart had no or low skills in construction, maintenance and repair activities; and no working knowledge of golf course maintenance or experience playing golf. In contrast, the successful applicant, Robert Sleep had experience playing golf, some knowledge of golf course maintenance, and overall more and higher skills in construction related activities.

 Once Defendant states a legitimate non-discriminatory reason for its action, the burden again shifts to the plaintiff to show that the stated reason is pretextual. This can be shown in one of three ways: 1) with evidence that the defendant's stated reason was false; 2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken under the circumstances; or 3) with evidence that defendant acted contrary to a company practice.[27] But, evidence of pretext may take "a variety of forms," including "revealing such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in the employer's proffered legitimate reasons that a reasonable fact finder could rationally find them unworthy of belief." [28]

Stewart has revealed weaknesses, inconsistencies and contradictions in Defendant's proffered reasons for not promoting him. Of course, Stewart believes that there is not much distinction between the landscaping and grounds keeping he did in Park Maintenance I. Although the plaintiff employee's opinions of his qualifications do not give rise to a fact issue,[29] other evidence in the record suggests that Stewart's experience in the Park Maintenance I, coupled with his construction related skills, qualified him for the Golf Course Maintenance II position. First, despite Opat's testimony that it was important that Golf Course Maintenance II employees have certain construction skills, Archie Larkin testified that in his 23 years in the position, he found that only five percent of his duties included things other than work directly related to grounds keeping and maintaining the golf course. Larkin testified that although he had smoothed concrete and operated a track loader, he had never been asked to do welding, plumbing, carpentry, or electrical work (other than changing light fixtures).

Moreover, although Opat testified that Sleep had experience playing golf, nothing in the record suggests that Sleep had any experience maintaining golf courses. Furthermore, the job announcement stated that experience maintaining golf courses was merely preferred, not required.

In addition, Doug Stuewe, a union steward, stated in his affidavit that his deposition testimony that Stewart was not qualified was erroneous. Stuewe stated that now that he had discovered a number of documents that Defendant failed to provide to him during his investigation of

---

26. See id.

27. Kendrick v. Penske Transp. Services, Inc., 220 F.3d 1220, 1230 (10th Cir.2000).

28. Barnett v. Boeing Co., 173 F.Supp.2d 1125, 1134–1135 (D.Kan.2001)[citing EEOC v. Horizon/CMS Healthcare Corp., 220 F.3d 1184, 1198 (10th Cir.2000) ].

29. Simms v. Oklahoma ex rel. Dept. of Mental Health and Substance Abuse Services, 165 F.3d 1321, 1329 (10th Cir.), cert.denied, 528 U.S. 815, 120 S.Ct. 53, 145 L.Ed.2d 46 (1999)[citations omitted].

Stewart's union grievance, Stuewe is convinced that Stewart was minimally qualified for the Golf Course Maintenance II position. If Stewart was minimally qualified, since he had five days seniority over Sleep, Defendant violated the union contract by not hiring Stewart over Sleep.

All of this gives rise to a genuine issue of fact concerning Defendant's proffered reason for not promoting Stewart to Golf Course Maintenance II. Therefore, the Court denies Defendant's motion on Stewart's failure to promote to this position.

### B. Failure to Promote–Recyclable Materials Collector/Driver Position

 Stewart applied for the Recyclable Materials Collector/Driver position in 1999. He was neither interviewed nor selected; and Defendant hired Eddie Spencer for the position. To make a prima facie case, Stewart must also establish that he was qualified for this position. He has not made that showing. It is undisputed that Stewart did not have a Class A vehicle operator's license with a HAZ–MAT endorsement. This requirement of a special driver's license is an objective requirement not subject to interpretation or dispute. Although Stewart argues that it was Defendant's practice to allow applicants to obtain their license during the probationary period, there is no support in the record for this assertion. Unlike the requirement for OSHA certification, the job announcement did not state that the special driver's license could be obtained after hiring. And, as this Court noted in the *Barnett v. Boeing Co.* case,[30] the relevant inquiry at the prima facie stage, "is not

whether an employee is able to meet all the objective criteria adopted by the employer, but whether the employee has introduced some evidence that he possesses the objective qualifications necessary to perform the job sought."

Stewart has failed to introduce any evidence that he possessed this objective qualification. Although Stewart states that Spencer did not have the special driver's license either, Stewart does not support this conclusory allegation with any reference to the record. Thus, Stewart does not genuinely controvert Defendant's statement that Spencer did have the requisite driver's license at the time he was hired. Summary judgment is granted on Stewart's failure to promote to this position.

### C. Failure to Promote–Park Maintenance II

 Again, the threshold question is whether Stewart met the minimal qualifications for the Park Maintenance II position. The Park Maintenance II position required skills and experience beyond those required for Park Maintenance I. For example, the Park Maintenance I required "knowledge of materials, methods, and techniques commonly used in park maintenance;" whereas the Park Maintenance II position required "knowledge of **equipment**, materials, methods and techniques used in the **construction** and maintenance of park **facilities**."[emphasis supplied]. Unlike the Park Maintenance I position, the Park Maintenance II position also required "[g]ood skills in operating **all** park maintenance equipment and machinery."[emphasis supplied].

30. 173 F.Supp.2d 1125, 1132 (D.Kan.2001)[citing *Horizon,* 220 F.3d at 1193–94].

Whereas the Park Maintenance I job definition included performing "unskilled work of routine difficulty in maintenance and repair," the Park Maintenance II job definition included performing "work of routine to considerable difficulty in a variety of park maintenance and construction duties which include skilled and unskilled work in construction, maintenance and repair." In essence, the Park Maintenance II position required skills in construction not necessary in the Park Maintenance I position. And, the Park Maintenance II position called for a higher level, and more difficult skills than the Park Maintenance I position. The Park Maintenance II position required a comprehensive knowledge of equipment, as well as more knowledge and skill in construction, maintenance and repair.

Stewart testified that he met the qualifications for Park Maintenance II, through his experience in Park Maintenance I and because he had some experience in operating some types of heavy equipment, as well as some construction related experience. Defendant counters that Stewart had no or low skills in construction related activities, and had only limited experience, operating two types of heavy equipment.

Once the defendant offers a legitimate non-discriminatory reason, the burden returns to the plaintiff, who must establish "a genuine dispute of material fact as to whether [defendant's] proffered reason for the challenged action is pretextual-i.e. unworthy of belief." [31] Some of the requirements for the Park Maintenance II position are subjective in nature. "Knowledge of equipment, materials, methods and techniques used in the construction and maintenance of park facilities," is subjective, not objectively measured by a test or other

means. Yet, Stewart had to have some knowledge, as the Park Maintenance I position also required "[k]nowledge of equipment, materials, methods, and techniques used in the construction and maintenance of park facilities."

Although the requirements for Park Maintenance II are mostly subjective in nature, the "Example of Duties" section of the job announcement lists equipment that the person would operate in the position. Whether a person can operate the types of equipment can be objectively determined. On the other hand, this list of equipment was not in the "Required Knowledge, Abilities and Skills" section of the job announcement; it was in the "Example of Duties" section, which does not state the minimum qualifications of the job. It was not a requirement that an applicant be able to operate every piece of equipment listed in the "Example of Duties" section. The person hired, Peter Espinoza, had no experience operating two of the listed types of equipment, a track loader and a trash truck. Although Stewart did not have skills in all construction related areas, and although it is disputed whether Stewart's level of skill was low or medium in certain construction related areas, Espinoza did not have skills in all areas either. Espinoza had little or no electrical experience.

There is other evidence creating an issue of fact regarding whether Defendant's proffered reason for not promoting Stewart is pretextual. First, Doug Stuewe's affidavit states that upon full discovery and informed investigation, he thinks Stewart was qualified for the Park Maintenance II position. Secondly, Stewart testified that the trainee program that Defendant implemented did not train Stewart to

31. *Randle v. City of Aurora*, 69 F.3d 441, 451 (10th Cir.1995).

do anything he did not already know, other than giving him one opportunity to train on a welder. Yet, Stewart passed the post training exam with no trouble. And, Stewart testified, after he was promoted, he was almost never called upon to undertake the construction related activities that Defendant proffered are so important to the position.

Finally, although "[a] comparison that reveals that plaintiff was only similarly qualified or not as qualified as the selected candidate would not raise an inference of racial discrimination,"[32] even if Espinoza's construction and heavy equipment skills exceeded Stewart's, Stewart had experience in the Park Maintenance I position, performing grounds keeping and landscaping duties on the very parks that the Park Maintenance II position had responsibility for. Again, given these differences in the candidates, there is a material issue of fact as to Defendant's proffered reason for not hiring Stewart.

■■■ The Court notes that Stewart's experience in undergoing the training and successfully passing the test raises an issue of pretext with respect to Defendant's proffered reason for not promoting Stewart in the first place. On the other hand, this evidence demonstrates that Stewart's claim of discriminatory testing should be denied as a matter of law. Stewart has also claimed that he was discriminated against by being subjected to tests that were discriminatory in design, purpose and impact, in violation of 29 C.F.R. § 1607.4. Yet, the only test administered to him was the skills test following his completion of the newly implemented trainee program. And, Stewart testified that the test was

fair, that he was competent to answer the questions, and believed he had passed the test. Stewart did pass the test. Stewart's claim of discriminatory testing therefore fails, for lack of any evidence in the record, and for failing to show any adverse employment action arising from any allegedly discriminatory test.

## IV. CONCLUSION

The Court grants Defendant's summary judgment motion on Stewart's claims for disparate pay, hostile work environment, and failure to promote to Recyclable Materials. Collector/Drive. Because the Court finds material issues of fact concerning the pretextual nature of Defendant's reason for not promoting Stewart to Golf Course Maintenance II and Park Maintenance II, Defendant's motion for summary judgment on those claims is denied.

**IT IS THEREFORE ORDERED BY THE COURT** that defendant's motion for summary judgment (Doc. 110) is GRANTED as to plaintiff's claims for 1) disparate pay; 2) hostile work environment; and 3) failure to promote to Recyclable Materials;

**IT IS FURTHER ORDERED** that defendant's motion for summary judgment is DENIED as to plaintiff's claims for 1) failure to promote to Golf Course Maintenance II and 2) failure to promote to Park Maintenance II.

**IT IS FURTHER ORDERED** that plaintiff's Motions to Strike (Doc. 115, 116 and 117) are DENIED.

IT IS SO ORDERED.

---

**32.** *Bullington v. United Air Lines,* 186 F.3d at 1319[quoting *Chock v. Northwest Airlines,* *Inc.,* 113 F.3d 861, 864 (8th Cir.1997)].